**UNITED STATES of America,**
**Appellee,**

v.

**Jerome DEUTSCH, Appellant.**

**Nos. 995, 996, Dockets 35468, 71–1180.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 9, 1971.

Decided Sept. 21, 1971.

Certiorari Denied Jan. 10, 1972.
See 92 S.Ct. 682.

John Van Voorhis, New York City, for appellant.

Jack Kaplan, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., Jay S. Horowitz, Richard J. Davis and Ross Sandler, Asst. U. S. Attys., New York City, on the brief), for appellee.

Before FEINBERG, MULLIGAN and TIMBERS, Circuit Judges.

**TIMBERS, Circuit Judge:**

This appeal presents questions of first impression under the Investment Company Act of 1940 (the Act). It involves the first criminal prosecution charging violations of § 17(e)(1) of the Act, 15 U.S.C. § 80a–17(e)(1)(1964), during the thirty years the Act has been on the books—willful violations of the Act being punishable by a fine of not more than $10,000 and/or imprisonment of not more than two years. 15 U.S.C. § 80a–48 (1964).

Jerome Deutsch appeals from a judgment of conviction entered upon a jury verdict after a six day trial in the Southern District of New York, Charles M. Metzner, *District Judge*, finding him guilty, in violation of 18 U.S.C. § 2 (1964), of aiding and abetting one Frank D. Mills in knowingly accepting compensation from the issuer of certain securities while Mills was acting as agent for certain registered investment companies, in violation of 15 U.S.C. § 80a–17(e)(1) (1964). Deutsch also appeals from Judge Metzner's order denying his post-conviction motion for *coram nobis* relief, 321 F.Supp. 1356. Finding no reversible error, we affirm.

### OFFENSES CHARGED

Deutsch was tried on one count of a seven-count indictment charging violations of § 17 of the Act, 15 U.S.C. § 80a–17(1964),[1] and of 18 U.S.C. § 2(1964).

---

1. Sections 17(d) and (e) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a–17(d) and (e) (1964), provide:

"(d) It shall be unlawful for any affiliated person of or principal underwriter for a registered investment company (other than a company of the character described in section 80a–12(d) (3) (A) and (B) of this title), or any affiliated person of such a person or principal underwriter, acting as principal to effect any transaction in which such registered company, or a company controlled by such registered company, is a joint or a joint and several participant with such person, principal underwriter, or affiliated person, in contravention of such rules and regulations as the Commission may prescribe for the purpose of limiting or preventing participation by such registered or controlled company on a basis different from or less advantageous than that of such other participant. Nothing contained in this subsection shall be deemed to preclude any affiliated person from acting as manager of any underwriting syndicate or other group in which such registered or controlled company is a participant and receiving compensation therefor.

(e) *It shall be unlawful for any affiliated person of a registered investment company*, or any affiliated person of such person—

(1) *acting as agent, to accept from any source any compensation* (other than a regular salary or wages from

Counts One and Two charged Detusch's co-defendant, Frank D. Mills, with knowingly effecting purchases of securities for his personal account and for the accounts of two registered investment companies of which he was an affiliated person, Puritan Fund, Inc. and Fidelity Trend Fund, Inc., in violation of § 17(d) of the Act, 15 U.S.C. § 80a–17(d) (1964). Counts Three and Four charged Deutsch with aiding and abetting these crimes, in violation of 18 U.S.C. § 2 (1964).

Count Five charged Mills with knowingly accepting compensation from Realty Equities Corporation in New York, the issuer of the securities, while Mills was acting as agent for the registered investment companies, in violation of 15 U.S.C. § 80a–17(e)(1)(1964). Count Six charged Deutsch with aiding and abetting this crime.

Count Seven charged both defendants with use of the mails in making false statements and omitting material statements regarding the transactions between Realty Equities and the investment companies with which Mills was affiliated, in violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (b) (1964), and of 18 U.S.C. § 2 (1964). The government consented to a dismissal of Count Seven prior to trial.

Mills pleaded guilty to Count One on April 7, 1970. After Deutsch's trial, Mills was fined $7,500 on May 19, 1970, and Counts Two and Five were dismissed. Trial of Deutsch alone commenced April 20 and ended April 27, 1970. Counts Three and Four were dismissed at the close of the government's case. The jury found Deutsch guilty on the remaining count, Count Six. Deutsch was fined $10,000 on August 4, 1970.

## TRANSACTIONS UNDERLYING OFFENSES CHARGED

Before discussing the claims raised on appeal, a narration of the events beginning in the summer of 1967 and culminating in the indictment returned April 11, 1969 is necessary to an understanding of the rather sophisticated crimes with which Mills and Deutsch were charged. Upon the record before us, the jury could have found as follows.

During the summer of 1967, Deutsch was executive vice-president and a member of the three-man board of directors of Realty Equities Corporation in New York, a real estate investment company listed on the American Stock Exchange. Realty had been founded by Deutsch and others in 1959. By 1968 it had consolidated assets of $137 million.

In the summer of 1967, Realty anticipated a forthcoming merger in connection with which it needed to raise a substantial amount of capital. Realty decided to finance the merger by a private placement, limited to institutional investors only, of $12 million in promissory notes with warrants attached. This security was to be issued in units of $500,000. Each unit was to consist of a $500,000 7½% 15-year promissory note, a warrant for the purchase of 37,500 shares of Realty stock at a gradually ascending price, and the right to use the note in lieu of cash when exercising the warrant. The purchase price of the unit

such registered company) *for the purchase* or sale *of any property* to or *for such registered company* or any controlled company thereof, except in the course of such person's business as an underwriter or broker; or

(2) acting as broker, in connection with the sale of securities to or by such registered company or any controlled company thereof, to receive from any source a commission, fee, or other remuneration for effecting such transaction which exceeds (A) the usual and customary broker's commission if the sale is effected on a securities exchange, or (B) 2 per centum of the sales price if the sale is effected in connection with a secondary distribution of such securities, or (C) 1 per centum of the purchase or sale price of such securities if the sale is otherwise effected unless the Commission shall, by rules and regulations or order in the public interest and consistent with the protection of investors, permit a larger commission." (Italicized provisions are those directly involved herein.)

was to be the face amount of the note. The initial exercise price of the warrant was to be the market price of Realty stock on the day before the first closing.

Deutsch was in charge of selling the issue. His initial efforts met with failure. As of December 4, 1967, he had not succeeded in selling a single note. While peddling this issue, however, Deutsch had his first contact with the co-defendant, Frank D. Mills, a contact which resulted in the first sale of Realty notes.

During the summer of 1967 and throughout 1968, Mills was a senior officer of Fidelity Management and Research Company in Boston, and of twelve mutual funds for which it acted as investment adviser. Mills was a member of the six-man investment committee of all the funds, whose aggregate assets exceeded $3.5 billion and whose combined stockholders numbered over 500,-000. As such, he participated in the preparation of periodic guidelines listing securities and maximum dollar values which the fund account managers could buy or sell without approval; he also was one of the two men whose approval was needed for any transaction outside the guidelines. Mills was the account manager of one of the funds, the Puritan Fund, and, as such, he had authority to buy or sell up to $2 million in any bond and up to the guideline limits for approved stocks. Mills also was vice-president of eight of the funds, including Puritan Fund and Fidelity Trend Fund. It is undisputed that Puritan and Fidelity Trend were registered investment companies and that Mills was an affiliated person of each of them within the meaning of the Act. 15 U.S.C. §§ 80a-2(3), 80a-3, 80a-8 (1964).

Deutsch's first contact with Mills occurred as a result of Deutsch's attempt, in the summer of 1967, to sell some of the issue to Massachusetts Mutual Life Insurance Company in Boston. Homer Chapin, executive vice-president in charge of investments, was also a director of Fidelity Management and the chairman of its investment committee. He told Deutsch that state insurance law barred Massachusetts Life from purchasing that type of security; but a few days later, Chapin recommended the issue to Mills, saying that from what he knew Realty was satisfactory in every way and that if he were interested he should contact Deutsch directly. The first sale of Realty notes ensued.

On December 8, 1967, Mills committed the Puritan Fund to purchase two notes. This first sale appeared to be the shot in the arm that Realty needed. With Mills' permission, Deutsch used Puritan's prestigious name in talking to prospective buyers. As Deutsch testified at trial, this was "a good sales pitch" and "very helpful." The entire offering was soon fully subscribed, and an additional $5 million in notes was authorized. This offering, too, was fully subscribed, with Puritan itself taking an additional $700,-000 on June 14, 1968, bringing its investment up to the statutory limit of 10% of the offering. By August 9, 1968, Realty had thus succeeded in borrowing $17 million.

On August 29, 1968, Deutsch again called Chapin who had recently joined Realty's board of directors at Deutsch's invitation. Realty had contracted to repurchase five units from Republic National Life Insurance Company in Texas, one of the original subscribers, and had an option to repurchase seven more, the balance of Republic's interest, at prices which were advantageous in view of an appreciable rise in the market price of Realty stock.[2] Meanwhile, Massachu-

---

2. From February through November, 1968, Realty stock was traded on the American Stock Exchange at the following prices:

| | High | Low |
|---|---|---|
| February | 20⅛ | 16⅛ |
| March | 18⅜ | 16⅛ |
| April | 20⅜ | 15¾ |
| May | 24⅛ | 19½ |
| June | 28⅛ | 22⅝ |
| July | 28¼ | 24⅝ |
| August | 31⅝ | 24⅝ |
| September | 32¾ | 30⅛ |
| October | 35½ | 29⅝ |
| November | 34½ | 30 |

setts law had changed, and the notes were now permissible purchases for insurance companies. Deutsch was thus able to offer to sell Massachusetts Life some of the Republic National Life units. Deutsch did not disclose the repurchase contract between Realty and Republic National Life. He led Chapin to believe that the seller was Republic National Life and that the price had not yet been negotiated. Deutsch pointed out to Chapin that the exercise price was 15¼ whereas the stock was trading at 32. Chapin said he was interested and asked for more information.

On September 11, Richard Dooley, a Massachusetts Life securities analyst to whom Chapin had referred the matter, told Deutsch that Massachusetts Life was rejecting the offer because of house counsel's opinion that the price was so advantageous it gave the transaction the appearance of being a corporate gift in view of Chapin's interlocking directorships.[3] Deutsch renewed the offer at a higher price, 7¾ premium per warrant instead of 3, saying that it brought the price into line with what he was told was the customary discount.[4] Counsel for Massachusetts Life still thought the price was too advantageous. On September 25, Dooley relayed his company's final rejection.

Some time between September 23 and September 26, Chapin told Mills about Realty's exceptional offer and suggested that Mills call Deutsch. However, unknown to Chapin, Mills already knew about Deutsch's offer and had taken steps to seize the opportunity for himself. On September 16, five days after the initial rejection by Massachusetts Life, Mills had approached the president of the National Shawmut Bank in Boston for the purpose of borrowing enough cash to buy a unit of the Realty securities for himself.

Mills told the bank that he wanted the transaction kept strictly confidential. To insure confidentiality, Mills asked the bank to make an exception to its general practice and to place the transaction in a nominee account. Shortly after September 24, the bank agreed to lend Mills $572,000 as the entire purchase price of a unit.

On September 30, a few days after the Shawmut Bank agreed to lend Mills the $572,000, the Banque de Paris bought two identical units from Republic National Life at a price per unit of $928,-125.

Some time in early October, Mills took two steps with respect to Realty securities. First, he gave a 50% participation in his private deal with Realty to a real estate investor named Philip Levin.[5]

3. On September 4, 1968, Deutsch told Chapin that the resale price of the notes had not yet been fixed, but that he thought Republic National Life would charge a relatively small premium for the warrants. A few days later, in a telephone conversation with Dooley, Deutsch said the premium to be charged was $3 per share, so that the effective conversion price would be 18¼. Dooley, aware that the stock was trading at 30¼, calculated that on a $1 million note the company would make an immediate paper profit of $900,000, and recommended purchase of what he thought was an exceptional bargain. It was the size of this "profit" which made house counsel reject the tempting offer.

4. Deutsch may have had ulterior motives in making this strenuous effort to sell the Realty securities to Massachusetts

Life at such an advantageous price. During the negotiations, Deutsch explained to Richard Dooley why he was offering this exceptional bargain to Massachusetts Life. Dooley testified at trial that Deutsch told him:
"Mass. Mutual and Realty Equities had a good business relationship, that he hoped this would continue, that the Realty Equities people loved Homer Chapin, that he hoped by extending this possible investment to us it would cement our relations over a period of time."

5. Levin estimated that the date upon which Mills first offered him half a note was "approximately" August 1968. Deutsch argues that Levin's testimony supports his contention that he, Deutsch, had made a commitment to sell a note to Mills in February or March 1968. There was

Second, he tried unsuccessfully to interest Richard Smith, the account manager of one-half of Fidelity Trend, to buy two notes for the fund.

On October 15, after his unsuccessful approach to Richard Smith, Mills approached the account manager of the other half of Fidelity Trend, Ross Sherbrooke. Mills said two units would be available for a little over $900,000 per unit, but that there was some urgency and that Sherbrooke had to make up his mind by October 17, after which the notes would no longer be available. Mills did not disclose that he and Levin were about to buy a unit themselves at a substantially lower price. On the same day, Mills told the Shawmut Bank that he was ready to proceed with the loan and would require only half the money since he was buying only half the unit.

Mills undoubtedly was influential in Sherbrooke's decision to buy the Realty notes.[6] Sherbrooke had never heard of Realty before. He looked up the company in standard reference books, asked a Fidelity specialist about it, and a day or so later told Mills he would take the two units. Mills was considerably senior to Sherbrooke. Since Sherbrooke had been on the job for only four months, he may well have been reluctant to reject his senior's suggestion. Sherbrooke at trial conceded that Mills' high opinion of Realty played a "significant role in influencing my judgment":

"I relied on Mr. Mills, on his judgment as one who knew the company better than I and who had some dealing with the security and the company through the ownership in Puritan Fund, and I regarded him as being knowledgeable on the subject and on

the company, and to that extent I relied on him."

Mills' and Levin's purchase and Fidelity Trend's purchase closed three days apart. Mills and Levin paid $537,000 for one unit on October 21; Fidelity Trend paid $928,125 per unit for two units—a total of $1,856,250—on October 24.

After his purchase was made, Mills continued to try to conceal the transaction. In violation of the Fidelity group's internal code of ethics, Mills did not report his purchase of the Realty note. Moreover, Mills had not requested advance approval of the transaction from the SEC, in violation of the regulations governing joint and several transactions of an affiliated person such as Mills and a fund such as Fidelity Trend. 15 U.S.C. § 80a–17(d) (1964); 17 C.F.R. § 270.-17d–1 (1971).

Deutsch also tried to conceal the transaction. He insisted that Levin use a nominee. When called before the SEC on November 22, 1968, he falsely testified that the two nominees were "two banks in the United States", when in fact Levin's nominee was Saul and Co. and Mills' nominee was Harris and Co. Deutsch also supplied the SEC with what he said was an office memorandum listing all subscribers and purchasers at resale. With respect to other nominees, this memorandum indicated the real parties in interest in parentheses; but with respect to Mills' and Levin's nominees, the real parties were not indicated.

At trial, the main thrust of Deutsch's defense was that he had agreed to sell a Realty note to Mills in February or March 1968 and that the actual sale the following October was the fulfillment of

evidence, however, from which the jury could have found that Levin was mistaken about the date. If Mills had approached Levin in August, why would Mills ask the Shawmut Bank for a loan to finance the purchase of an entire unit on September 16? Moreover, Mills did not inform the bank until October 17 that he would require only half the money since he was buying only half the unit.

6. Mills actually was one of the two members of the investment committee who approved the transaction. This approval, however, was not technically necessary. Sherbrooke sought approval even though he did not need it, because he had been on the job for only four months and the investment was out of the ordinary.

a promise made at a time when Deutsch had no idea that the notes would be worth so much more than face value.

Deutsch testified that on February 29, 1968, after the closing of the sale of two Realty notes to Puritan, Mills told him he wanted personally to buy a note; that the next day, Deutsch told Realty's president, Morris Karp, about Mills' request and that Karp said it could not be done on original issue, but that Mills could purchase one of the notes on re-sale; and that several weeks later, near the end of March, Deutsch told Mills, "I got approval from Morris that if there is ever a resale you can have it for whatever price we get it for," to which Mills' response was, "Great. You got a deal."

Despite Deutsch's customary practice of making notes on his way home from negotiations, he made none of this commitment. His promise was not reflected in any contemporaneous writing. Moreover, this alleged oral agreement was not binding on Realty. See N. Y. Uniform Commercial Code, §§ 8–319 and 2–201 (McKinney 1964).

Morris Karp, Realty's president, and David Stein, Realty's counsel, testified on Deutsch's behalf. While their testimony generally corroborated that of Deutsch, several inconsistencies between their testimony and Deutsch's could have led the jury to disbelieve Deutsch's story of the February-March commitment.

## CLAIM THAT TRIAL COURT MIS-INTERPRETED § 17(e)(1) OF THE ACT

The essential issues on this appeal require interpretation of § 17(e)(1) of the Act, 15 U.S.C. § 80a–17(e)(1)(1964). While this is the first criminal prosecution under § 17(e)(1), the SEC has had occasion at the administrative level to construe this section of the statute.[7] Prior to the instant case, however, no court, so far as we know, has discussed the intent of Congress in enacting § 17(e)(1).[8]

Unfortunately, the legislative history affords little help in our present task of construing § 17(e)(1). While enactment of the Act was preceded by lengthy hearings,[9] the section in question was explained only once during these proceedings, and this brief comment sheds little light on Congressional intent.[10]

---

7. Some of the SEC's more recent decisions involving § 17(e) (1) are: Cornfield, Securities Exchange Act Release No. 9091 (March 1, 1971) ; Provident Management Corporation, Securities Exchange Act Release No. 9028 (December 1, 1970) ; Dishy, Easton and Company, Securities Exchange Act Release No. 8702 (September 23, 1969) ; Consumer-Investor Planning Corporation, Securities Exchange Act Release No. 8542 (February 20, 1969) ; Imperial Financial Services, Inc., Securities Exchange Act Release No. 7684 (August 26, 1965).

8. In Entel v. Guilden, 223 F.Supp. 129 (S.D.N.Y.1963), aff'd sub nom. Neuwirth v. Allen, 338 F.2d 2 (2 Cir. 1964), the court decided that § 17(e) of the Act created a private right of action for the benefit of an investment company and that the right could be exercised secondarily by holders of perpetual warrants issued by the investment company. The court, however, did not attempt to unravel the proper meaning of § 17(e) (1).

Several district courts also have entered decrees enjoining violations of § 17(e), but they have not attempted to construe that section of the Act. See SEC v. Bernhard & Co., Current CCH Fed.Sec.L.Rptr. ¶ 93,059 (S.D.N.Y. May 26, 1971) ; SEC v. Commonwealth Security Investors, Inc., [1969–1970 Transfer Binder] CCH Fed.Sec.L.Rptr. ¶ 92,859 (E.D.Ky.October 21, 1970).

Our Court has dealt with other subsections of § 17: SEC v. Sterling Precision Corporation, 393 F.2d 214 (2 Cir. 1968) (§ 17(a) (2)) ; SEC v. Talley Industries, Inc., 399 F.2d 396 (2 Cir. 1968) (§ 17 (d)). But these opinions do not help us in interpreting § 17(e) (1).

9. Hearings on S. 3580 Before a Subcomm. of the Senate Comm. on Banking and Currency, 76th Cong., 3d Sess. (1940) (Senate Hearings) ; Hearings on H.R. 10065 Before a Subcomm. of the House Comm. on Interstate and Foreign Commerce, 76th Cong., 3d Sess. (1940) (House Hearings).

10. This comment occurred during the Senate Hearings, *supra* note 9, at 262, and is set forth at p. 108, *infra*, of this opinion.

The Senate and House Reports on the Act [11] also fail to deal specifically with § 17(e)(1). Congress did set forth in the Act a declaration of Congressional policy and specific findings, based on the SEC Report mentioned below. Section 1 of the Act, 15 U.S.C. § 80a-1 (1964).

The Act resulted from a four-year study of the investment company industry by the SEC.[12] The SEC Report depicted fantastic abuse of trust by investment company management and wholesale victimizing of security holders. The Act evolved from a bill which was based on the conclusions and recommendations of the SEC Report. After hearings had been held on a bill drafted by the SEC, the industry and the Commission worked out a compromise bill which passed without a dissenting vote.[13]

█ The Senate and House Reports indicate that the Act was designed primarily to correct the abuses of self-dealing which had produced injury to stockholders of investment companies.[14] Four sections of the Act, including § 17, were aimed specifically at insuring the independence of management and its fidelity to stockholders.[15] Congress recognized that its existing laws were inadequate to prevent the abuses of self-dealing. Several times during the hearings, Senators questioned SEC attorneys on their inability to obtain convictions, thus evincing a concern about the difficulties of obtaining convictions for abuse of trust in the investment company industry.[16] At one point, David Schenker, Chief Counsel of the SEC Investment Trust Study and one of the drafters of the Act, said:

> "When you deal with investment companies, because of the peculiar nature of their assets—they deal in securities—it is difficult to convince a jury in certain situations. We tried to set forth broad standards to prohibit transactions like the ones that have been recounted, because we knew the difficulty of trying to convince a jury of larcenous intent and conspiracy." Senate Hearings, *supra* note 9, at 131.

The Act was thus designed in part quite clearly to establish broad standards which would more easily enable the government to convict affiliated persons for self-dealing in the management of investment companies—an industry the very nature of which made it particularly difficult to gather proof.

11. S.Rep.No.1775, 76th Cong., 3d Sess. (1940) (Senate Report); H.R.Rep.No. 2639, 76th Cong., 3d Sess. (1940) (House Report).

12. SEC Report on the Study of Investment Trusts and Companies (SEC Report). The SEC Report was issued in five parts: The Nature, Classification and Origin of Investment Companies, H.R.Doc.No.707, 75th Cong., 2d Sess. (1939); Statistical Survey of Investment Trusts and Investment Companies, H.R.Doc.No.70, 76th Cong., 1st Sess. (1939); Abuses and Deficiencies in the Organization and Operation of Investment Trusts and Investment Companies, H.R.Doc.No.279, 76th Cong., 2d Sess. (1940); Control and Influence Over Industry and Economic Significance of Investment Companies and Conclusions and Recommendations, H.R. Doc.No.246, 77th Cong., 2d Sess. (1942).

13. For a discussion of the events leading to the enactment of the Act and about the Act generally, see Motley, Jackson and Barnard, Federal Regulation of Investment Companies Since 1940, 63 Harv.L. Rev. 1134 (1950); Jaretzki, The Investment Company Act of 1940, 26 Wash. U.L.Q. 303 (1941); Comment, 50 Yale L.J. 440 (1941).

14. The Senate Committee on Banking and Currency reported:

> "Basically the problems flow from the very nature of the assets of investment companies. The assets of such companies invariably consist of cash and securities, assets which are completely liquid, mobile and readily negotiable. Because of these characteristics, control of such funds offers manifold opportunities for exploitation by the unscrupulous managements of some companies." Senate Report, *supra* note 11, at 6. See also *id.* at 7.

15. The others were Sections 9, 10 and 15(c) and (d), 15 U.S.C. §§ 80a-9, 10 and 15(c) and (d) (1964).

16. See Senate Hearings, *supra* note 9, at 131 and 971.

*Interpretation of the Phrase "Acting as Agent"*

Section 17(e)(1), so far as here relevant, provides as follows: "It shall be unlawful for any affiliated person of a registered investment company, . . . acting as agent, to accept from any source any compensation . . . for the purchase . . . of any property . . . for such registered company. . . ."

Deutsch does not dispute the fact that Mills was an affiliated person within the meaning of the Act and that Puritan and Fidelity Trend were registered companies. He contends, however, that the trial court misconstrued the phrase "acting as agent." He argues that this phrase makes the violation proscribed by § 17(e)(1) incomplete unless the compensation actually caused a fund to purchase or sell securities. The trial court rejected Deutsch's proposed construction and charged the jury that:

> "The Government does not have to show that Mills was influenced by the compensation he received or that as a result of receiving it Mills caused either of the funds to purchase the notes or influenced others in either of the funds to make such purchase."

Moreover, the trial court, interpreting the phrase as being merely descriptive of a subclass of affiliated persons, instructed the jury on the element of acting as agent in the following manner:

> "You may find that he acted as an agent if you determine that he had the power to make investment decisions for Puritan Fund at the time of its purchases or that as a result of his position in the company he could influence the decisions regarding the purchases by Fidelity Trend of Realty Equities notes."

We believe that the trial court's interpretation of the phrase "acting as agent" was incorrect but that, if anything, it imposed a greater burden on the government in proving its case than was necessary and therefore Deutsch was not prejudiced.

Section 17(e)(1) does not explicitly make it an element of the offense that the recipient of the compensation take any action as a result thereof. Deutsch argues that the draftsman's use of a verb in the phrase "acting as agent" expresses a Congressional intent to prohibit only gratuities which succeed in influencing the recipient's conduct. We find it hard to believe, however, that a Congress which had recognized that the investment company industry "offer[ed] manifold opportunities for exploitation by unscrupulous managements . . . .," Senate Report, *supra* note 11, at 6, meant that an offense was complete only when the affiliated person acted as a result of receiving something of value. Rather, we believe that the more reasonable interpretation is that an offense under § 17(e)(1) is complete when the compensation is delivered and received with the forbidden intent. The objective of § 17(e)(1) is to prevent affiliated persons from having their judgment and fidelity impaired by conflicts of interest. It is clear that, as soon as Mills purchased the Realty note at a reduced price, he was inhibited by a conflict of interest which could easily becloud his judgment to the detriment of the beneficiaries of the funds. The abuse which § 17(e)(1) was designed to prevent—affiliated persons operating under conflicts of interest—was complete when Mills received the compensation, even if he never exerted any influence on Realty's behalf. Moreover, to accept Deutsch's construction would emasculate § 17(e)(1). Given the nature of the investment company industry, it would be extremely difficult to prove that the payment of compensation actually caused a particular purchase. It is most unlikely that Congress intended a construction which would rob § 17(e)(1) of its effectiveness.

Our interpretation of the phrase "acting as agent," namely, that it is a descriptive phrase and does not require a showing that the recipient of the compensation took any action as a result thereof, appears to be buttressed by the

SEC's administrative views. In Provident Management Corporation, *supra* note 7, the SEC found a violation of § 17 (e)(1) when an investment adviser to a registered investment company retained fees which rightfully belonged to the company. On three occasions, when the investment company tendered its holdings of securities in certain companies pursuant to public tender offers, Porteous, the president of the investment adviser, caused his company to be designated as soliciting agent and received and retained approximately $42,000 in tender fees from those inviting the tenders. The SEC held that the retention of the tender fees by Porteous constituted an impermissible form of compensation derived from the investment company's portfolio transactions. In so holding, however, the Commission did not find that the retention of the tender fees had caused Porteous to take any improper action. Instead, the mere retention of the fees constituted a violation of § 17(e)(1), because the SEC recognized that to permit the investment adviser to retain the fees would create a conflict of interest which might influence the adviser's future advice to the investment company: "To countenance such conduct would permit the determination whether an investment company's portfolio securities should be tendered to be influenced by considerations relating to the affiliate's compensation, and thereby create a conflict of interest between those acting in a fiduciary capacity for the investment company and the fund." *Id.* at 9.

Similarly, in Imperial Finance Services, Inc., *supra* note 7, the SEC found that actual conduct as a result of being compensated was not an essential element of the offense proscribed by § 17 (e)(1). There the SEC held that it was a violation of § 17(e)(1) for an officer of an investment adviser to an investment company to buy securities at a discount from a broker-dealer, because the officer "was in a position to influence" the choice of broker-dealers who would be granted business through transactions in the investment company's portfolio securities. *Id.* at 10. See also Consumer-Investor Planning Corporation, *supra* note 7. It is true that in the latter two cases the affiliated person probably acted as a result of receiving compensation, but the opinions do not turn on this.

Our interpretation of the phrase "acting as agent," that it is not necessary to show actual conduct as a result of the compensation, further appears to be consistent with decisions of this Court and of other Courts of Appeals interpreting statutes analogous to § 17(e)(1) which likewise are designed to prevent officials and other "insiders" from operating under conflicts of interest. In United States v. Irwin, 354 F.2d 192 (2 Cir. 1965), cert. denied, 383 U.S. 967 (1966), we held that it was not necessary to show actual conduct to prove the unlawful payment of a gratuity to a public official under 18 U.S.C. § 201(f)(1964): "It is not necessary for the Government to show that the gift caused or prompted or in any way affected the happening of the official act." 354 F.2d at 197. In Howard v. United States, 345 F.2d 126 (1 Cir.), cert. denied, 382 U.S. 838 (1965), the First Circuit said that under the anti-kickback statute, 41 U.S.C. § 51 (1964), the crime is "complete upon the acceptance of a bribe regardless of whether or not improper action is thereafter taken." 345 F.2d at 128. See also Krogmann v. United States, 225 F.2d 220, 225 (6 Cir. 1955) (the offense defined by the predecessor to 18 U.S.C. § 201(b) "was complete upon the payment of money to Krueger . . . ."); Smith v. United States, 305 F.2d 197, 210 (9 Cir.), cert. denied, 371 U.S. 890 (1962) (the statute, 18 U.S.C. § 434, superceded by 18 U.S.C. § 208, "is directed not only at dishonor, but also at conduct that tempts dishonor . . . ." and "whether he actually gives or withholds instructions . . . is immaterial").

■ Rejection of Deutsch's construction does not make the phrase "acting as agent" superfluous. It defines a subclass of affiliated persons. Within the

statutory scheme of § 17(e), affiliated persons who are acting as brokers may receive limited compensation in connection with portfolio transactions of the registered investment company. 15 U.S.C. § 80a–17(e)(2) (1964). If affiliated persons are not acting as brokers, however, but otherwise are acting as agents of the investment company, they cannot accept compensation in connection with the purchase or sale of securities. While § 17(e) is far from a model of clarity, we believe that an affiliated person is acting as agent within the meaning of § 17(e)(1) in all cases when he is not acting as broker for the investment company.

■ The government and the trial court believed that the phrase "acting as agent" defined a more limited subclass of affiliated persons: those who have the capacity to influence investment decisions. This construction, we believe, is inconsistent with other sections of the Act and with other subsections of § 17 itself. One of the primary objectives of the Act was to prevent affiliated persons, and affiliated persons of such persons, from self-dealing and from operating under conflicts of interest. To achieve this objective, Congress thought it necessary to prohibit affiliated persons from engaging in certain types of conduct; accordingly, all other sections of the Act, including the other subsections of § 17, prohibit all affiliated persons from engaging in the unlawful conduct. There is no reason to believe that Congress intended to allow certain affiliated persons to accept compensation with the forbidden intent and be immune from violating § 17(e)(1).[17] We believe that the more reasonable interpretation of "acting as agent" is that it is a descrip-

tive phrase distinguishing affiliated persons acting as brokers from those who are not acting as brokers in connection with a sale or purchase of securities for an investment company.

■ In view of our interpretation of the phrase "acting as agent," we believe that the trial court erred in submitting to the jury the issue of whether Mills was acting as agent. As we have indicated, "acting as agent" does not require a showing that Mills took any action as a result of being compensated. Since Deutsch did not dispute the facts that Mills was an affiliated person and that Mills was not acting as broker, we believe that the government established, as a matter of law, that Mills was acting as agent for the investment companies within the meaning of § 17(e)(1). While the trial court erred in submitting this issue to the jury, it was harmless error, for Deutsch suffered no prejudice. See United States v. Guidice, 425 F.2d 886, 890 (2 Cir. 1970); United States v. Mingola, 424 F.2d 710, 713 (2 Cir. 1970); United States v. Ragland, 375 F.2d 471, 479 (2 Cir. 1967), cert. denied, 390 U.S. 925 (1968).

■ Deutsch makes one final contention about the phrase "acting as agent." He maintains that the phrase was intended to mean acting as agent for an outsider dealing with the investment company and not as agent for the investment company itself. This contention is without merit.

The only support for Deutsch's contention is an isolated comment by David Schenker, Chief Counsel of the SEC Investment Trust Study, during the hearings on the Act. In discussing the rea-

---

17. The government contends that subsection (e)(1) is more stringent than the other subsections of § 17 in that § 17(b) allows for exemptions for some subsections, but not for subsection (e)(1). From this, the government concludes that § 17(e)(1) applies to a more limited class of affiliated persons than the other subsections of § 17. However, § 6(c) of the Act, 15 U.S.C. § 80a–6(c)(1964), per-

mits the SEC to exempt any person from any provision of the Act. This section has been used by the SEC to exempt certain transactions which might otherwise have violated § 17(e)(1). See Drexel & Co., 37 S.E.C. 574 (1957); Axe-Houghton Fund, Inc., 25 S.E.C. 133 (1947); Bankers Securities Corporation, 24 S.E.C. 398 (1946); Pathe Film Corporation, 10 S.E.C. 483 (1941).

sons for § 17(d), which is now § 17(e)(1), Mr. Schenker said:

> "You might say, Why did the Commission write that? That is because we found cases where although the controlling person did not sell any property to the investment trust, he was a real estate agent in the transactions in which real estate was sold to the investment trust, and we feel under those circumstances that he has this conflict of interest. But he can act as the underwriter or the distributor of securities." Senate Hearings, *supra* note 9, at 262.

While this comment at first blush would appear to substantiate Deutsch's claim that the phrase was intended to apply to agents of outsiders dealing with the investment company, it is far from conclusive. The attorney may have been referring to only one reason for drafting § 17(e)(1). Moreover, this isolated comment is insignificant when weighed against the repeated administrative adjudications of the SEC that "acting as agent" means acting as agent for the investment company. See *supra* note 7. On balance, we believe that the more reasonable interpretation is the one adopted by the SEC.

■ Accordingly, we hold that Deutsch was not prejudiced by the trial court's interpretation of the phrase "acting as agent."

### Requisite Intent Under § 17(e)(1)

Deutsch maintains that the evidence was insufficient to prove that compensation was given with the intent to influence. We find it unnecessary to reach this issue, because we believe that the trial court erred in charging the jury that, in order to convict, they must find that the compensation was given and received with the intent to influence Mills.[18]

The language of § 17(e)(1) makes no mention of intent to influence; the subsection is cast in the familiar "for" terminology of the gratuity statutes (e. g., 18 U.S.C. §§ 201(f-i)(1964)) where the only intent required is that the payment be given and accepted in appreciation of past, or in anticipation of future, conduct. We have held that intent to influence is not an element of 26 U.S.C. § 7214(a)(2) (1964), which makes it a crime for a federal officer "acting in connection with" the revenue laws to receive "compensation . . . for the performance of any duty." United States v. Cohen, 387 F.2d 803, 806 (2 Cir. 1967), cert. denied, 390 U.S. 996 (1968). Similarly, we have held that the government does not have to show intent to influence to prove an offense under 18 U.S.C. § 201(f)(1964), which makes it a crime to give a public official something of value "for and because of any act performed or to be performed." United States v. Irwin, 354 F.2d 192, 197 (2 Cir. 1965), cert. denied, 383 U.S. 967 (1966). See also, United States v. Umans, 368 F.2d 725, 730 (2 Cir. 1966), cert. dismissed as improvidently granted, 389 U.S. 80 (1967).

■ The statute in the instant case is similar in this respect to the gratuity statutes. We do not believe that Congress intended that intent to influence should be read into § 17(e)(1) of the Act. The paying of compensation is an evil in itself, even though the payor does not corruptly intend to influence the affiliated person's acts, for it tends to bring about preferential treatment in favor of the payor which can easily injure the beneficiaries of investment companies. Congress recognized that affiliated persons had manifold opportunities

---

18. The trial court's charge on this point was as follows:

> " . . . you must determine whether or not the compensation was accepted for the purchase of securities by either Puritan Fund in February or June or by Fidelity Trend Fund in October.
>
> If the evidence persuades you beyond a reasonable doubt that Mills held a position where he could influence the purchase of these securities by Puritan Fund or Fidelity Trend Fund and that he was given this compensation because of this position with the intent of influencing him, and that Mills knew that this was the purpose of the compensation, then you may find that this aspect . . . is established."

for self-dealing and designed a statute to remove the potential for conflicts of interest by prohibiting the receipt of compensation "for the purchase or sale of any property. . . ." 15 U.S.C. § 80a–17(e)(1) (1964). We hold that to read into § 17(e)(1) a requirement of intent to influence would frustrate this statutory purpose.

■■■ Since the requisite intent under § 17(e)(1) is intent to give and accept a gratuity in appreciation of past or future conduct, we believe that the evidence was sufficient to prove the necessary intent with respect to the transactions by both Puritan Fund and Fidelity Trend Fund. The jury was justified in finding that the sale of the note at a discounted price was compensation in appreciation of past conduct "which met with [Deutsch's] satisfaction." United States v. Cohen, *supra*, 387 F.2d at 806. Deutsch's efforts to sell the issue were unsuccessful until Mills, by committing Puritan to purchase two notes, gave Realty the boost which eventually turned the issue into an overwhelming success. It is equally clear that the jury was entitled to infer that the compensation was "for" the purchase by Fidelity. Mills' conduct in urging the Realty notes on the two managers of the Fidelity Trend Fund is not readily understandable except in the context of Deutsch's relationship to Mills. It would seem unlikely that Mills would want Fidelity Trend to purchase Realty notes at the same time he did, because he would thereby create an invidious comparison between the bargain opportunity he received and the far more expensive purchase he recommended for the fund with which he was affiliated.

■■■ The trial court's error in charging the jury that intent to influence was a necessary element of the offense did not prejudice Deutsch, for the erroneous charge merely "exacted a higher standard of proof than the law required." Killian v. United States, 368 U.S. 231, 258 (1961). In United States v. Heine, 149 F.2d 485 (2 Cir.), cert. denied, 325 U.S. 885 (1945), we held

that it was not prejudicial for the trial court to read to the jury a prior version of the statute which contained a specific intent provision omitted from the version under which the defendant was prosecuted: "[I]f it influenced the jury at all, [it] must have done so favorably to defendant." 149 F.2d at 488. At most, the erroneous charge here imposed on the government the burden of proving an additional element of the offense. The instructions on intent therefore could only have been favorable to Deutsch and do not necessitate reversal. See United States v. Umans, *supra*, 368 F.2d at 729.

## CLAIM THAT STATUTE IS VOID FOR VAGUENESS

■■■ Deutsch claims that § 17(e)(1) of the Act is unconstitutional because the language is so vague as to be void under the due process clause of the Fifth Amendment. This claim is without merit.

■■■ The applicable test is whether the language conveys "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." United States v. Petrillo, 332 U.S. 1, 8 (1947). See United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns, 443 F.2d 463, 466 (2 Cir. 1971). A statute violates due process if "men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Construction Co., 269 U.S. 385, 391 (1926). Even in criminal cases, however, where the vagueness standard is most stringently applied, the statute must only present "ascertainable standard[s] of guilt." Winters v. People of State of New York, 333 U.S. 507, 515 (1948). As the Supreme Court stated in *Petrillo*:

"That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense.

. . . The Constitution does not require impossible standards." 332 U.S. at 7.

We do not believe that Deutsch was "required at peril of life, liberty or property to speculate as to the meaning of penal statutes." Lanzetta v. State of New Jersey, 306 U.S. 451, 453 (1939). Section 17(e)(1) clearly places men of reasonable intelligence on notice that affiliated persons cannot accept compensation in connection with the purchase or sale of property to or for their affiliated investment companies. The phrase "acting as agent" is not so vague as to make men of common intelligence guess at its meaning.[19] We believe that § 17(e)(1) establishes standards of guilt which are at least as definite as those in a gratuity statute, e. g., 18 U.S.C. § 201(f)(1964), which withstood this same constitutional challenge in United States v. Irwin, *supra*, 354 F.2d at 196.

## CLAIM THAT THERE WAS INSUFFICIENT EVIDENCE TO PROVE COMPENSATION

Deutsch argues that the evidence was insufficient to prove the statutory element of compensation. He admits that he sold Mills a note at a substantial discount in October and he does not dispute the trial court's definition of compensation as a "benefit or thing of value [including] being granted an opportunity to purchase securities at a discount price." He claims, however, that he made a commitment to sell one of the notes to Mills in February or March

1968 and that when he made this commitment he had no idea that the Realty note and attached warrant would be so valuable eight or nine months later. He contends that, since compensation must be paid and accepted knowingly and willfully to render him guilty, he did not violate § 17(e)(1) by fulfilling an oral agreement which was made with no intention of selling at a discount price.

The trial court, accepting Deutsch's contention that the jury must acquit if they found Deutsch had agreed to sell Mills a Realty note in February or March 1968, instructed the jury as follows:

"If you find that Mills was granted the opportunity for the first time in September or thereafter to purchase these securities at a price which was significantly lower than the price charged other buyers at the same time, then you may find that Mills received compensation in the form of this reduced price.

If, on the other hand, you find that the commitment to Mills was made in February, then you should acquit the defendant."[20]

■ In view of the jury's verdict, they evidently chose to disbelieve Deutsch's story of a February-March commitment. Deutsch now contends that the issue of compensation should never have gone to the jury, because the government failed to challenge his affirmative defense with directly contradictory proof, and because there was insufficient evidence to prove that the first time Deutsch offered the deal to Mills was

19. Deutsch's claim that § 17(e)(1) fails to establish an ascertainable standard of guilt is undermined by his and Mills' evasive conduct in trying to conceal the transaction.

20. Deutsch argues on appeal that the trial court's instructions on the February-March commitment improperly placed the burden of proof on him. However, the instructions given were substantially those requested; and in colloquy prior to summations, defense counsel specifically requested the charge on the February-March commitment, despite the trial judge's warning that the jury might misunderstand and think the defense had the burden. There being no plain error, Deutsch's failure to make timely objection below precludes him from raising this issue on appeal. United States v. Peltz, 433 F.2d 48, 53 n. 6 (2 Cir. 1970); United States v. Proner, 405 F.2d 943, 945 (2 Cir.), vacated on other grounds, 395 U.S. 823 (1969); United States v. DiBrizzi, 393 F.2d 642, 646 (2 Cir. 1968); United States v. Indiviglio, 352 F.2d 276 (2 Cir. 1965) (en banc), cert. denied, 383 U.S. 907 (1966).

in September 1968. These contentions are without merit.

Deutsch's claim that the government was required to offer proof which directly contradicted his testimony about the February-March commitment is frivolous. In Misciale v. United States, 356 U.S. 386, 388 (1958), the Supreme Court held that a jury was entitled to disbelieve the defendant's testimony that an informant trapped him into meeting with an undercover agent, notwithstanding the fact that the defendant's testimony was uncontradicted because of the informant's failure to testify. See also Turner v. United States, 426 F.2d 480, 482 (6 Cir. 1970), cert. denied, 402 U.S. 982 (1971) (alibi defense presents question of fact for jury); Bushaw v. United States, 353 F.2d 477, 480 (9 Cir.), cert. denied, 384 U.S. 921 (1966). That no February-March agreement existed could be proved by evidence of objective facts and circumstances having a rational tendency to show, and from which the jury rationally and logically could find, that no agreement was made. In light of the inherent implausibility that Realty would orally contract, without consideration, to sell a valuable security, at some indefinite time in the future, at an indefinite price, the jury was warranted in disbelieving Deutsch's story. The jury's disbelief is further supported by inconsistencies within Deutsch's own testimony and between his testimony and that of his colleagues, Karp and Stein.

There also was sufficient evidence to entitle the jury to find that the first time Deutsch offered the deal to Mills was in September 1968. The alleged commitment was that Mills could purchase a Realty note on resale when one became available. Notes did become available for resale in August 1968. But Deutsch contacted Massachusetts Life, not Mills, about the possibility of purchasing the securities. Mills did not approach the Shawmut Bank for a loan until September 16, five days after the initial rejection of Deutsch's offer by Massachusetts Life. The jury could logically find that Deutsch did not make

an offer to Mills until Massachusetts Life had first turned it down and that Mills had then gone to the bank to see if he could borrow money to purchase the note. Thus, there was sufficient evidence for the jury to find that the offer to Mills was first made between September 11 and 16.

In any event, the trial court's instructions on this issue were more favorable than those to which Deutsch was entitled. He was entitled to an instruction merely that the jury could not convict without being persuaded beyond a reasonable doubt that the agreement to buy a Realty note was made with the knowledge that it constituted something of value. The jury would have been justified in finding that the alleged February-March commitment was something of value. It was an option, obliging Mills to do nothing, but entitling him to buy a Realty note if circumstances made it profitable for him to do so. Options to purchase securities constitute a significant form of executive compensation. Since Deutsch viewed the commitment as binding, the jury would have been entitled to find that the alleged February-March commitment satisfied the statutory element of compensation.

## CLAIM THAT EVIDENCE OF MILLS' CRIME WAS IMPROPERLY ADMITTED

Deutsch argues that he was denied his Sixth Amendment right of confrontation when the trial court admitted evidence which tended to prove that Mills failed to report his personal investment in Realty. We hold that the trial court properly admitted this evidence.

The challenged evidence consists of three documentary exhibits: a copy of an internal code of ethics circulated among all Fidelity officers and employees which required them to make monthly reports of securities they purchased; Mills' monthly reports for the period December 1967 through December 1968, which failed to reflect his purchase of the Realty note; and an SEC statement that there was no record of Mills ever

having sought SEC permission to purchase the security. The trial court admitted the three documents and carefully instructed the jury that they were received solely as proof of the guilt of Mills.[21]

■ We believe that the trial court's ruling was correct. Proof of the guilt of the principal is admissible at the trial of an accomplice. Roth v. United States, 339 F.2d 863, 865 (10 Cir. 1964); Meredith v. United States, 238 F.2d 535, 542 (4 Cir. 1956); Colosacco v. United States, 196 F.2d 165, 167 (10 Cir. 1952). The documents could be considered by the jury as independent evidence of Mills' guilt, for they showed evasive conduct aimed at concealing the transaction and constituted circumstantial evidence of guilty consciousness; as such, they were independently probative of his guilt. Mikus v. United States, 433 F.2d 719, 728 (2 Cir. 1970); United States v. Tropiano, 418 F.2d 1069, 1081 (2 Cir. 1969), cert. denied sub nom. Grasso v. United States, 397 U.S. 1021 (1970); United States v. Montalvo, 271 F.2d 922, 927 (2 Cir. 1959), cert. denied, 361 U.S. 961 (1960); United States v. Smolin, 182 F.2d 782, 786 (2 Cir. 1950).

■ Deutsch's reliance on Bruton v. United States, 391 U.S. 123 (1968), is misplaced. The documents did not constitute hearsay, for they were not offered for the truth of the matter asserted. Rather, the government offered the documents as circumstantial evidence of Mills' failure to report the transaction, from which the jury could infer consciousness of guilt. Assuming that the documents constituted hearsay, however, there are good reasons why Bruton should not apply here. The trial court's prompt and clear explanation of the limited purpose for which the records were received was sufficient to negate any possibility of prejudice. See United States ex rel. Nelson v. Follette, 430 F.2d 1055, 1059 (2 Cir. 1970); United States v. Cusumano, 429 F.2d 378, 381 (2 Cir. 1970), cert. denied sub nom. Riggio v. United States, 400 U.S. 830 (1970); United States v. Sparano, 422 F.2d 1095, 1099–1100 (2 Cir. 1970). Moreover, since these documents did not contain any inculpatory statements as to Deutsch, Bruton is not applicable. United States ex rel. Nelson v. Follette, supra, 430 F.2d at 1058; United States v. Tropiano, supra, 418 F.2d at 1080–81.

## CLAIM OF IMPROPER COMMENTS ON MILLS' ABSENCE FROM TRIAL

Deutsch argues that he was denied a fair trial as the result of certain remarks made by the trial court and the government attorney concerning the absence of Mills as a witness at the trial. We hold that this claim is without merit.

The circumstances surrounding Mills' absence are set forth in an affidavit of Charles A. Stillman, Esq., a member of the firm of Botein, Hays, Sklar and Hertzberg, counsel to Mills, which was filed in opposition to Deutsch's coram nobis petition. The affidavit discloses Mills' availability during the trial:

"3. At the time of Mr. Mills plea, I informed Government counsel and counsel for the defense that Mills would testify for either side if called as a witness. To this end, Mr. Mills spoke with Assistant United States At-

---

21. The trial court's instructions when the three documentary exhibits were admitted were as follows:

"Ladies and gentlemen of the jury, as I think I indicated to you in the beginning, Mr. Mills is charged with violation of the law. Mr. Deutsch is charged with aiding and abetting Mr. Mills in the violation of the law. In order for Mr. Deutsch to be convicted, the government will have to prove that Mr. Mills violated the law. That is one of the burdens the government will have, in addition to certain others.

So these exhibits are being offered solely proving that Mr. Mills violated the law. You have to get over that hurdle first before you can ever take up the question of whether Mr. Deutsch aided and abetted Mr. Mills in violating the law."

torney Naftalis on a number of occasions. In addition, Mr. Mills was subpoenaed by counsel for Deutsch as a witness at trial. However, subsequently counsel for Deutsch informed me that Mills would not be called as a witness. Because of the possibility that Mills might be called as a witness by either the defense or prosecution, I had Mills remain in New York City during the course of the trial."

During summation, defense counsel interjected the issue of Mills' absence by indicating that the government should have called Mills and that his absence meant the government felt his testimony would be damaging to its case:

"Deutsch doesn't have the job of proving he is innocent. They have the job of proving he is guilty, and they didn't bring in the one man that could have contradicted three decent, intelligent human beings who have never been in trouble in their lives. . . ."

The government's brief response included the following:

"I can call any witness in the United States and subpeona him whose testimony I think would be favorable and Mr. Gould can subpoena any witness in the United States of America whose testimony Mr. Gould thinks will be favorable. If Mr. Gould thought Mr. Mills' testimony was favorable, he had the power to subpoena him."

Defense counsel made no objection to this argument either at the time of, or after, summation, but it is now challenged for the first time on appeal. Nor did the defense take exception to the trial court's instruction which it now challenges:

"I point out to you that Mills is not under the control of either the government or the defendant. Either side could have subpoenaed him to appear as a witness.

Under the circumstances you are free to draw whatever inference you wish as to the failure of either party to call Mills, and you need not draw any inference if you do not wish to."

There being no plain error, Deutsch's failure to raise this issue below precludes him from raising it now. United States v. Peltz, 433 F.2d 48, 53 n. 6 (2 Cir. 1970); United States v. Proner, 405 F.2d 943, 945 (2 Cir.), vacated on other grounds, 395 U.S. 823 (1969); United States v. DiBrizzi, 393 F.2d 642, 646 (2 Cir. 1968); United States v. Murphy, 374 F.2d 651, 655 (2 Cir. 1967); United States v. Indiviglio, 352 F.2d 276 (2 Cir. 1965) (en banc), cert. denied, 383 U.S. 907 (1966).

Aside from the lack of timeliness, there is no merit to Deutsch's claim. Mills was available to both defense and government. The trial court was correct in charging that the jury was free to draw an inference against either party. United States v. DiBrizzi, *supra,* 393 F.2d at 646; United States v. Armone, 363 F.2d 385, 404–05 (2 Cir.), cert. denied, 385 U.S. 957 (1966); United States v. Beekman, 155 F.2d 580, 584 (2 Cir. 1946). Moreover, the government's summation clearly was proper. It was merely responsive to defense counsel's summation. United States v. DiBrizzi, *supra,* 393 F.2d at 645–46.

Deutsch's contention that Mills was actually under the government's control is not supported by the record. He cites no authority for his proposition that a witness who is awaiting sentence on one count and trial on others is under the control of the government. His claim that Mills presumptively was biased against him likewise is unsupported by the record. Deutsch's argument that his and Mills' identity tended to merge during the trial, so that comment on Mills' failure to testify was improper under Griffin v. California, 380 U.S. 609 (1965), is frivolous. Deutsch himself testified, and the identities of the two men were carefully distinguished throughout the trial.

## CLAIM THAT GOVERNMENT SUMMATION DEPRIVED DEUTSCH OF FAIR TRIAL

Deutsch contends that the summation of the government attorney was improper in that it contained misstatements of law and inflammatory remarks. We hold that this claim is without merit.

Deutsch complains primarily about two statements made during the government's summation:

(1) "What the Government has to prove is the only reason he gave Mr. Mills the money was because of who Mr. Mills was and what he potentially could do for him and what he had done for him in the past."

(2) "He gave him the money because Mr. Mills is an important man who can do favors in the future. Whether or not the specific favors were the contemplation of Mr. Deutsch at the time he tried and succeeded in corrupting Mr. Mills is unimportant. Whether they were or not, he got a quick return for his money."

The first remark is consistent with the trial court's instructions that the government had to prove Deutsch compensated Mills with the intent of influencing him, and that Mills accepted the deal on that basis. While we have held that the trial court erred in its charge on intent, the remark by government counsel was consistent with the trial court's charge and could not have prejudiced Deutsch by exacting a higher degree of intent than was necessary.

The second remark consists of two parts. One is merely a passing comment on Deutsch's motives and was fair comment on the evidence. The second part of the remark does appear to be inconsistent with the trial court's instructions on the requisite intent. This remark is consistent, however, with our interpretation of the statute, and Deutsch can claim no prejudice.

Deutsch also argues that it was irrelevant and inflammatory for the government to refer to his sophistication in financial matters and to his insistence that Mills and Levin use nominee names. This claim clearly is without substance. Deutsch's sophistication was relevant to show knowledge on his part of what he was doing. His insistence on the use of nominee names evinced a desire to conceal the transaction, from which the jury could infer consciousness of guilt. Moreover, in the context in which the statements were made, they fairly pointed out appropriate inferences to be drawn from the proof and were not inflammatory. *Cf.* United States v. Edelman, 414 F.2d 539, 542 (2 Cir. 1969), cert. denied, 396 U.S. 1053 (1970); United States v. Capaldo, 402 F.2d 821, 825 (2 Cir. 1968), cert. denied, 394 U.S. 989 (1969); United States v. DiBrizzi, *supra*, 393 F.2d at 646; United States v. DeAlasandro, 361 F.2d 694, 697 (2 Cir.), cert. denied, 385 U.S. 842 (1966); United States v. DeFillo, 257 F.2d 835, 840 (2 Cir. 1958), cert. denied, 359 U.S. 915 (1959).

## CLAIM THAT DISMISSAL OF COUNT FIVE PRECLUDED CONVICTION ON COUNT SIX

Finally, Deutsch argues that he could not be convicted as an aider and abettor on Count Six, because Count Five charging Mills as principal subsequently was dismissed. This claim is without merit.

At Deutsch's trial in April 1970, the trial court instructed the jury that, in order to find Deutsch guilty as an aider and abettor, they first had to find that Mills had committed the principal offense, i. e. had violated § 17(e)(1) of the Act. In view of the verdict, the jury must have found that Mills had violated § 17(e)(1). The fact that Count Five subsequently was dismissed when Mills was sentenced the following month does not undermine the conviction of Deutsch on Count Six.

To sustain the conviction of one who has been charged as an aider and abettor, it is necessary that there be evidence showing an offense to have been committed by the principal, and that the principal was aided and abetted by the accused. It is not incumbent upon the

prosecution, however, to prove that the principal has been either convicted or acquitted of the offense. Hendrix v. United States, 327 F.2d 971, 975 (5 Cir. 1964); Perkins v. United States, 315 F.2d 120, 122 (9 Cir. 1963); Meredith v. United States, *supra*, 238 F.2d at 542; Colosacco v. United States, *supra*, 196 F.2d at 167. In the instant case, the government presented sufficient evidence to establish that Mills had committed the offense. That was all the government was required to show.

We have considered Deutsch's other claims of error and find them to be without merit.[22]

Affirmed.

22. Except to the extent mentioned in the foregoing opinion, we do not find it necessary to discuss separately Deutsch's claims raised on the appeal from denial of his post-conviction motion seeking coram nobis relief. His claims on that appeal are not materially different from those raised on the appeal from his judgment of conviction. We have considered them carefully and find them without merit.