EDWARD J. MAWOD & COMPANY and Edward J. Mawod, Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 77–1495.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 16, 1978.

Decided Jan. 24, 1979.

Richard J. Leedy, Salt Lake City, Utah, for petitioners-appellants.

Michael K. Wolensky, Asst. Gen. Counsel, Securities and Exchange Commission, Washington, D. C. (Harvey L. Pitt, Gen. Counsel, Paul Gonson, Associate Gen. Counsel and Willie M. Alexander, Atty., Securities and Exchange Commission, Wash-

ington, D. C., on brief), for respondent-appellee.

Before HOLLOWAY and DOYLE, Circuit Judges, and STANLEY,* Senior District Judge.

WILLIAM E. DOYLE, Circuit Judge.

The appellants consist of Edward J. Mawod and Company together with Edward J. Mawod, individually, who was a principal of the Mawod brokerage firm. The cause is here on a petition for review of an order of the Securities and Exchange Commission issued May 6, 1977, which order suspended Mawod from association with any broker or dealer for one year and which revoked the broker-dealer registration of Mawod and Company. The request of the company to withdraw its registration as a broker-dealer was denied.

It was found that Mawod had willfully aided and abetted violations of the antifraud provisions of § 17(a) of the Securities Act of 1933 together with the Securities Exchange Act. The basic question here is whether there was sufficient evidence plus inferences to be drawn therefrom to justify the action which was taken by the Commission. We affirm the Commission order.

Proceedings before the Commission took place on August 29, 1974, pursuant to the applicable provisions of the Securities Act. Involved were alleged activities claimed to constitute a market manipulation of the common stock of Epoch Corporation. Following the evidentiary hearing before the administrative law judge, an opinion was issued which held that Mawod and Company and Mr. Mawod had willfully violated various provisions of the Securities Act and the Securities Exchange Act as charged. The petitioners obtained review by the Commission of the decision of the administrative law judge. That body issued its order imposing the sanctions which are here the subject of complaint.

There was evidence designed to show that Mr. Mawod was not a novice as far as the securities business was concerned. He started in the securities business in 1950, and from that time on worked for various firms as an assistant broker. The predecessor of the Mawod firm, Parker-Mawod & Company, was created in 1968. On September 11 of that year, Mawod became a broker-dealer. Sometime later, the firm changed its name to Mawod and Company. It ceased to do business in 1973, after the present investigation by the Securities and Exchange Commission was started.

Edward Mawod was at all times the controlling owner and the sole general partner. He was the principal trader and the active manager. He also made the policy decisions as to use of the company facilities and determined all day to day management matters, conferring with the employees in charge of particular operations.

The so-called Epoch account is the center of complaint. This was a real estate corporation which was incorporated in 1972. This company was not substantially funded. The owners contributed $1,000. They had office space contributed by a third person, one Yeaman, who became its financial adviser. The founders dropped out soon after it started, leaving the financial adviser in charge.

A Regulation A exemption was filed for the purpose of an exemption allowing the sale of stock to the public. The offer contained in the notification to the Commission called for the sale of the stock at $.20 a share. Transamerican Securities, Inc. was chosen as the underwriter for this public offering. All proceeds for the offering were to be escrowed until a minimum of $25,000 was received. To obtain this amount made it necessary to sell 125,000 shares, to be accomplished within six months or the money would be refunded to the purchasers. The offering started on July 28, 1972, and was closed on October 27, 1972. 187,000 shares were sold for $37,400. 125,000 shares were sold to a friend of Yeaman for $25,000. The president of Transamerican purchased 7,000 shares and an additional 5,000 shares were purchased

* Of the District of Kansas, sitting by designation.

by the trader and the principal at another brokerage firm. As a result, 159,500 shares of the total were purchased by persons who were close to the promoters. Following the termination of the offering, Epoch was more or less inactive, and during the first several months there was not much trading in the stock. Nevertheless, Transamerican raised the price between November 1972 and January 1973, to $.75 a share.

In March 1973, Epoch answered an ad by an Osterloh & Durham Insurance Brokers of North America, Inc., seeking a merger. It wished to merge with a public company. Yeaman introduced a Mr. Martin of the Osterloh Company to Mr. Hale, who controlled the 125,000 shares of the block of Epoch stock. An arrangement was made for Hale to sell his shares to Mr. Martin on an installment basis at $.25 per share. After that, Martin introduced Yeaman to Joe C. O'Quinn and Michael Strand. Strand was introduced as the person who would pursue the merger. He and O'Quinn proceeded to complete this merger.

Mawod had prior knowledge as to Strand's practices. He had theretofore prevented Strand from trading at Mawod and Company. Notwithstanding that previous experience, Mawod changed this policy and allowed Strand to resume active trading. Strand did not trade in his own name. Instead he used a nominee account in the name of Lois Linford. Mawod designated a Mr. Airsman to watch the Strand and O'Quinn activities. This fact has some significance in that it tends to indicate that Mawod had some concerns or apprehensions concerning the Strand and O'Quinn activities.

Strand and O'Quinn brought other brokers into the effort. Soon thereafter, O'Quinn sold 500 shares through Transamerican at 1¼. The quotes for that day were, however, ⅜–⅝ ask.

On April 19, O'Quinn sold 1,100 shares at $1.75 to a customer of Mawod and Company. As of that time there were six brokers quoting Epoch at prices up to 1⅝ bid and 2⅛ ask. The record does not disclose that there was any activity in the business that justified these relatively high figures. A number of trades were arranged by Strand and O'Quinn with other brokerage firms. These included "wash" sales and so-called "matched" orders. Strand and O'Quinn persuaded brokers to quote Epoch stock.

The evidence showed that there were special efforts on the part of O'Quinn and Strand to create a market for the Epoch stock by quoting it and by floating rumors as to a possible merger. The efforts of O'Quinn and Strand bore some fruit consisting of sales at prices which bore no particular relationship to the intrinsic value of the stock.

During all this time Strand was permitted to use the trading room at Mawod and Company and to use hand signals for trading in Epoch stock. Strand spent several hours a day for approximately five weeks at Mawod's office during that period. Evidence was offered from which an inference could be drawn that there were so-called directed sales.

During the period of April 1973 through most of June, there were 30 trades in Epoch stock all of which were executed by Mawod and Company. These were carried out by Strand and O'Quinn. In late June, Mawod decided not to continue business with Strand and O'Quinn because of apprehension that O'Quinn and Strand would be unable to pay their obligation. Mawod terminated their relationship with Mawod and Company. Almost immediately the stocks dropped and Mawod and Company ceased trading it. Mawod then reduced its quotes considerably and Epoch's market price dropped fast until finally Mawod's quotes of Epoch's stock on its so-called pink sheets were stopped altogether.

In August 1974, the present proceedings were commenced before the Commission. The complaint alleged that the petitioners (Mawod and Mawod and Company), along with several others, engaged in a scheme to defraud investors and inflate the market with respect to the stock of the Epoch Corporation. The charges included some 20 respondents including four registered broker-dealers. In addition to Mawod and

Company, there was Continental Securities, Inc., Associated Underwriters, Inc. and Universal Underwriting Service. All of these respondents, with the exception of Mawod and Company, Mr. Mawod, John Airsman and three others, consented to findings and sanctions without admitting or denying guilt as to the violations. With respect to the other three individuals referred to but unnamed, the proceedings were discontinued. John Airsman did not seek review of the administrative law judge's decision. Accordingly, they became final as to him.

The essence of the case against Mawod and Company consisted of the activities which caused the stock of Epoch to rise from $.20 to over $2.00. Following the merger with another corporation, the stock rose to $10.00 and finally returned to a low level. The Commission found that Epoch's only attraction for the purposes for which it was used was that it had public character. However, the stock had not previously had any trading. The company was a mere shell. Ordinarily it would not have had any market, much less the variations that it experienced. Frequently, the evidence showed, the seller and the buyer were one and the same. Sometimes there was an identical buyer and seller who were working together. The order to buy was contemporaneous with the order to sell. It was these trading practices which were found by the Commission to be manipulative in nature. These were so-called "matched" trades and "wash" sales. The Commission believed from the evidence that the entire scheme was orchestrated by Strand and O'Quinn trading through the offices of Mawod and Company.

The Commission found that Mawod was fully aware that Epoch was a new company that had little going for it absent a merger, and that any hopes of entering into a profitable merger were dependent on Epoch's being presented as a publicly held company.

In determining that Mawod and Company had violated and aided and abetted violations of the Securities laws, the Commission pointed to the manipulations by Strand and O'Quinn of the Epoch stock and the fact that O'Quinn and Strand were working together by means of a joint ownership interest on the account at Mawod. The Commission also relied on their failure to pay for purchases in the O'Quinn account within the days required, and the fact that there was not a cancellation or liquidation of the transaction in accordance with Federal Reserve Board regulations. Mawod was held directly responsible for failure of Mawod and Company's records to disclose Strand's ownership interests in the O'Quinn account as required by SEC regulations, and the Commission's determination also included Mawod's failure to cancel or liquidate the transactions as required by Federal Reserve Board regulations. It was also found that Mr. Edward Mawod had reason to know that Strand and O'Quinn had used the Mawod firm for their dealings. From this it was concluded that Mawod had acted unprofessionally and that he had willfully aided and abetted violation of the relevant provisions of the Securities Act and the Securities Exchange Act by allowing Strand and O'Quinn to manipulate the sales of Epoch stock on the Mawod premises using the Mawod facilities.

Due to the gravity of the transactions, the Commission decided that it was in the public interest to revoke the broker-dealer's registration of Mawod and Company and that the violations called for suspension of Mawod from association with any broker-dealer for one year.

From the evidence the Commission gleaned that Strand and O'Quinn worked closely together. Indeed Strand admitted that he had engaged in "float" sales and "matched" trades, all the time claiming that his actions were innocent.

There was over 2500 pages of testimony, and from all of this the Commission concluded that there were Regulation T violations, namely, improperly extending credit and failing to properly maintain books and records, plus the aiding and abetting of a scheme to manipulate the market in over-the-counter sales contrary to § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), and § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule

10b–5, which was promulgated pursuant thereto.

## I.

### STANDARDS OF REVIEW

■ The Administrative Procedures Act, 5 U.S.C. § 551 *et seq.*, is fully applicable here as is the Securities Act of 1933, 15 U.S.C. § 77i, and the Securities Exchange Act of 1934, 15 U.S.C. § 78y. Pursuant to these laws, this court conducts a review of an agency hearing so as to ascertain whether the agency decision is supported by substantial evidence. *Hagen Investment Co. v. SEC,* 460 F.2d 1034 (10th Cir. 1972); K. Davis, *Administrative Law of the Seventies* (Supplement to Administrative Law Treatise), ¶ 29.00 (1976).

■ Decisions by the agency based on credibility are not reviewable by this court unless they are contradicted by "uncontrovertible documentary evidence or physical facts." *NLRB v. Dixie Gas, Inc.,* 323 F.2d 433, 435 (5th Cir. 1963); *Olin Construction Co., Inc. v. Occupational Safety & Health Review Commission,* 525 F.2d 464, 467 (2d Cir. 1975). *See also NLRB v. Bausch & Lomb, Inc.,* 526 F.2d 817, 822 (2d Cir. 1975).

## II.

### IMPROPER EXTENSION OF CREDIT

■ Petitioners' first contention is that the SEC was in error in finding that the company improperly extended credit to J. C. O'Quinn. It is argued that there was insufficient evidence to support the allegation that Mawod and Company violated § 7(c)(1) of the 1934 Act, 15 U.S.C. § 78g, and Regulation T.

The Commission found that O'Quinn was too slow in meeting some of his obligations; that on several occasions he did not pay for his purchases within the seven-day period provided for in Regulation T, 12 C.F.R.

§ 220.4(c)(2).[1] From that the administrative law judge ruled, and we believe correctly, that Mawod and Company had violated § 7(c)(1) of the 1934 Act, 15 U.S.C. § 78g(c)(1). This latter section provides:

It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

(1) on any security (other than an exempted security), in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section; . . .

Petitioners' contention is that the evidence at most showed that there was a credit balance in the O'Quinn account and hence the Commission decided erroneously in ruling that if there was an overall credit balance but payment was, at times, made after the expiration of the seven-day period, Regulation T was applicable. They further argue that the O'Quinn account was not even a special cash account controlled by § 4(c)(2), but that it was in fact a C.O.D. account under the provisions contained in § 4(c)(5) of the regulation, which provides:

If the creditor, acting in good faith in accordance with paragraph (c)(1) of this section, purchases a security for a customer, or sells a security to a customer, with the understanding that he is to deliver the security promptly to the customer, and the full cash payment to be made promptly by the customer is to be made against such delivery, the creditor may at his option treat the transaction as one to which the period applicable under the paragraph (c)(2) of this section is not the 7 days therein specified but 35 days after the date of such purchase or sale.

The evidence supports the decision of the Commission. An expert witness, Mr. Ralph

---

1. Section 220.4(c)(2) reads:

In case a customer purchases a security (other than an exempted security) in the special cash account and does not make full cash payment for the security within 7 days after the date on which the security is so purchased, the creditor shall, except as provided in subparagraphs (3) through (7) of this paragraph, promptly cancel or otherwise liquidate the transaction or unsettled portion thereof.

Beam, a securities analyst, testified as to his familiarity with Regulation T and to his analysis of the degree of compliance with the regulation which was shown by Mawod and Company. The witness testified at length on cross-examination that he found several violations of the regulation. Testimony given, supported by documentary evidence, provided sufficient basis for the conclusion that trading took place in the O'Quinn account, and provided an adequate basis for the administrative law judge and subsequently for the Commission to find that on certain occasions there was no compliance with this regulation.

Much of the debate had to do with the debit and credit balance in the O'Quinn account at various times; whether the maintenance of a certain credit balance was designed to pay for a certain sale; and whether there were sufficient funds to cover all of the purchases. Actually whether there was or not, it was irrelevant, because of the lack of evidence that the credit balance was ever used for the purpose of covering purchases. Indeed there is no showing that Mawod and Company had received the authorization necessary indicating that such transfers were to be made.

■ It has been held that the presence of funds in other accounts does not atone for a violation of Regulation T. *Security Planners Associates, Inc., et al.,* 444 S.E.C. 738, 741 (1971).[2]

Alternatively, it is contended by appellants that a 35-day time period should have been applied to C.O.D. accounts, which they

say the O'Quinn account was. Mawod and Company had, however, made it clear that C.O.D. accounts are not available to customers. This policy was adopted by Mawod in June 1972, long before the O'Quinn transaction.

## III.

## SUFFICIENCY OF THE EVIDENCE WITH RESPECT TO RECORD-KEEPING VIOLATIONS

■ The Commission found that Mawod and Company and Mr. Mawod had violated the Commission rules with respect to the keeping of records as to the beneficial owner of money in an account.[3]

The administrative law judge also found that Mawod and Company had violated the recordkeeping provisions for four other accounts. The Commission overruled the administrative law judge as to these, holding that the evidence was insufficient on them. However, it does not follow that the evidence is insufficient to show that Strand had control over or a beneficial interest in the O'Quinn account. Petitioners point to a letter that O'Quinn had provided which they said satisfies the recordkeeping requirements, but the Commission rejected this position. The rule requires that one who claims an interest in the account must have a beneficial interest. Control is not the criterion. The regulation supports this.

Furthermore, the evidence supports the conclusion that there was a violation. Mr. Airsman was one witness who testified con-

2. In this connection, agency rulings in their specialized areas are to be regarded by courts with some degree of deference. *Cf. Washington v. Davis,* 426 U.S. 229, 247, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

3. The words of the finding are:
 [M]any of the orders in O'Quinn's account were actually placed by Strand. And when money was due O'Quinn, the firm's checks were often made payable to Strand. Yet the firm's records with respect to O'Quinn's account made no reference to Strand's ownership interest in it. Nor did those records indicate that Strand was authorized to transact business for the O'Quinn account. Our Rule 17a–3(a)(9) under Section 17(a) of the

Exchange Act requires that there be "a record in respect of each . . . account containing the name and address of the beneficial owner." It also requires a record of the names "of the person or persons authorized to transact business" for a joint account. Both requirements were flouted here. Accordingly, we find that [Mawod & Co.] willfully violated Rule 17a–3(a)(9) and Section 17(a). We also find that [Mr.] Mawod willfully aided and abetted that willful violation. These derelictions were not trivial. Our recordkeeping rules are a keystone of the surveillance of brokers and dealers by our staff and by the securities industry's self-regulatory bodies.

cerning this and Mr. Strand also. But there is other evidence showing that when money was to be paid by Mawod to the O'Quinn account, the checks were usually made out to Strand. The accounts of Mawod did not reflect Strand's interest in the O'Quinn account. Strand made certain admissions as to his exercising control of the account.

There is ample basis for the Commission's determination that Strand traded in and had some interest in the O'Quinn account. Unquestionably the Mawod firm was aware of the relationship between Strand and O'Quinn. The evidence above described satisfies the requirements of law. These charges are sustained by it.

## IV.

### SUFFICIENCY OF THE EVIDENCE TO SHOW MANIPULATION

The principal question in the case is whether there is evidence of the existence of a scheme to manipulate the price of Epoch stock, which was aided and abetted by the petitioners here.

■ We have here two customers who are known to have been in an alliance in trading on an extensive scale in the stock of an obscure over-the-counter company, and the general partner, Mr. Mawod, knew or had reason to know that such trading was economically irrational. The inference to be drawn is that the partner participated in the manipulation and thus aided and abetted the manipulators' violations of § 17(a) of the Securities Act, 15 U.S.C. § 77q(a), § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5.

■ The Commission undertook to prove that Strand's activities together with others was the prime force behind the trading in Epoch stock, and that the various actions were designed to raise the price of the stock and, in fact, they succeeded in doing so. This, it is contended, shows a manipulative intent, and it is said that this conduct falls under the condemnation of § 17(a) of the 1933 Act, § 10(b) and Rule 10b-5 of the 1934 Act.

The so-called "wash" sales through a nominee, "float" trades and "match" trades all show the appearance of volume trading. There is no challenge to the conclusion that manipulations were taking place at least by the active participants and also the Mawod firm and Mawod. The latter maintained, however, that they did not know what was causing it.

Strand was spending three to four hours a day in the trading room. He admitted talking to Mr. Mawod several times, but contended that the conversations did not bear on what was going on. There is a good deal of evidence dealing with the float trade and the wash sale, and inasmuch as these are matters that are peculiarly subject to Commission insight, we are not disposed to question the accuracy of the Commission's findings when these prohibited activities were going on. This is part of the agency evaluation process and the exercise by it of judgment on behalf of the public. From what we have seen, we are of the opinion that the evidence is sufficient to satisfy the substantial standard.

The remaining question is whether Mawod and the Mawod Company aided, abetted and assisted in violation of the 1933 Act, and, secondly, whether they acted willfully in connection with their violations of § 10(b) of the 1934 Act and Rule 10b-5.

### ·V.

### SCIENTER IN THE 1934 ACT

■ Petitioners say that there must have existed a willfulness in accordance with *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). We recognize that under the doctrine of *Ernst & Ernst,* scienter is an essential element. However, it must be noted in this connection that the wash sale and matched order are per se manipulative and are so regarded in the *Ernst & Ernst* scheme of things. *Id.* at 206, 96 S.Ct. 1375. *See also Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1976).

■ Knowledge of the illegality of the scheme is, of course, essential to aiding

and abetting. In addition, the party charged with aiding and abetting must have rendered substantial assistance. *See Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38 (2d Cir. 1978). If one acts with knowledge, he will generally, of course, be acting willfully. *See Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 886 (3rd Cir. 1975). In *Stead v. SEC,* 444 F.2d 713, 716 (10th Cir. 1971), *cert. denied,* 404 U.S. 1059, 92 S.Ct. 739, 30 L.Ed.2d 746 (1972), we held that where one was aware or should have been aware of the improper goings-on in an investment firm, he was subject to a finding that he willfully violated the recordkeeping provisions of the 1934 Act.

In *Wasson v. SEC,* 558 F.2d 879 (8th Cir. 1977), it was held that willfulness existed under the 1934 Act where the defendant had acted with reckless indifference (to a known obligation or set of facts). Similarly, we held in *Quinn & Co. v. SEC,* 452 F.2d 943, 947 (10th Cir. 1971), that where brokers are obligated to investigate, the failure to do so subjects them to a holding that they acted willfully. *See also* Restatement (Second) of Torts § 500, which lends much support to this position.

 Whether willfulness is present must, of course, depend upon the evidence in that particular case. *Crane Company v. Westinghouse Air Brake Co.,* 419 F.2d 787 (2d Cir. 1969). We need only say that Mawod was certainly aware of the presence of Strand and O'Quinn in the trading room of the Mawod firm. There is a necessary awareness also of the ups and downs of the Epoch stock, particularly the ups. These were enough to bring the matter home to Mr. Mawod. It is argued, however, that *Hochfelder* requires something more than what was shown. We must disagree. *Hochfelder* does not require that there be premeditated malice. It recognized that the carrying on of a manipulative or deceptive device or contrivance was itself evidence that knowledge existed. *Hochfelder,* it is to be noted, did not express any view as to whether the doctrine should apply to a case such as this public action. However, the Commission assumed that the *Hochfeld-*

er standard did apply, and we make the same assumption.

The cases are not in full accord on applicability of *Hochfelder* to a case such as this. The prevailing rule would appear to be that willful or reckless behavior satisfies the scienter requirement. *SEC v. Coven,* 581 F.2d 1020 (2d Cir. 1978); *Sanders v. John Nuveen & Co., Inc.,* 554 F.2d 790, 792 (7th Cir. 1977); *SEC v. Coffey,* 493 F.2d 1304, 1314 (6th Cir. 1974); Comment, *Scienter and SEC Injunction Suits,* 90 Harv.L.Rev. 1018, 1025 (1977).

Giving full effect to the scienter requirement, we conclude that the evidence here was sufficient.

## VI.

## APPLICABILITY OF SCIENTER TO THE 1933 ACT

 Some issue is made of whether the *Hochfelder* doctrine applies to the alleged violation of the 1933 Act, § 17(a) thereof. A strong argument can be made for the proposition that the scienter element is not essential to proving a case under § 17(a)(2) of the 1933 Act. Section 17(a)(2) deals with the obtaining of money by use of untrue statements or the withholding of the truth. Section 17(a)(3) prohibits the engaging in actions which would operate as fraud or deceit. The language of that provision is similar to Rule 10b–5. However, the Supreme Court in *Hochfelder* refused to give the Rule 10b–5 effect to § 17(a). The Fourth and Second Circuits have ruled recently that there is no requirement of scienter in proceedings under § 17(a)(2) of the 1933 Act where injunction is sought. *See SEC v. American Realty Trust,* 586 F.2d 1001, 1006 (4th Cir. 1978). *See also SEC v. Covens, supra.* The absence of words like "manipulative or deceptive device or contrivance" moved the Second Circuit to hold that scienter was not an essential element in this kind of case. The standard adopted in this latter case was action with knowledge that the act would be used in furtherance of illegal activity.

The Commission here found that Mawod had acted recklessly since he should have known of the conduct involved and that it was fraudulent. In our view the Commission ruling was in accordance with the *Hochfelder* decision and it should be upheld.

Certain acts which might be regarded as alleged trial errors are also asserted. We see no need for discussing these, for we do not regard them as serious. Our view of the Commission determination of this cause is that it was sufficient and valid, and it should be and it is hereby approved.