**John P. DECKER, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 78–2008.

United States Court of Appeals, Tenth Circuit.

Argued May 6, 1980.

Decided Aug. 18, 1980.

James T. Bunch, Denver, Colo. (Lester R. Woodward, Denver, Colo., with him on brief) of Davis, Graham & Stubbs, Denver, Colo., for petitioner.

Jacob H. Stillman, Washington, D. C. (William A. Dietch and S. Lee Terry, Jr., Washington, D. C., with him on brief), for respondent.

Before McKAY and SEYMOUR, Circuit Judges, and PECK, Senior Circuit Judge [*].

McKAY, Circuit Judge.

Petitioner appeals from an order of the Securities and Exchange Commission censuring him for aiding and abetting a violation of § 17(e)(1) of the Investment Company Act of 1940, 15 U.S.C. § 80a–17(e)(1).

The Forum Corporation (Forum) was a registered investment advisory firm. Forum Investment Counselors, Inc. (FIC), was a wholly owned subsidiary of Forum. In August 1972, when petitioner became affiliated with Forum, Forum was the investment advisor for The One Hundred Fund, Inc. (Fund), a registered investment company. From September of 1972 to August of 1974, petitioner served as portfolio manager for the Fund. As such, he selected the brokers who would handle the purchase and sale of securities on behalf of the Fund.

One of the brokers used by petitioner to handle Fund business was Jesup & Lamont, Inc. (J & L), a stock brokerage company based in New York City. Jesup & Lamont International Limited (J & L International) is a London–based, wholly–owned subsidiary of J & L. In approximately September of 1972, J & L International entered into a contract with FIC, Forum's subsidiary, whereby FIC agreed to provide various investment and research services to J & L International for one year for $25,000. This agreement was renewed in September of 1973 for one additional year. During the two-year period that the agreement between FIC and J & L International was in force, Forum significantly increased the amount of brokerage business it gave to J & L.[1]

The Commission is of the view that the $50,000 paid by J & L International to FIC, purportedly for investment and research services, was actually intended partially as compensation to Forum for an increase in Fund brokerage business allotted to J & L. Accordingly, the SEC's Division of Enforcement charged Forum, FIC, J & L, petitioner and two other individuals[2] with violating or

---

[*] Of the United States Court of Appeals, Sixth Circuit, sitting by designation.

[1] The following chart shows, for each of several years, the dollar amount of commissions paid by the Fund to J & L, the total amount of commissions paid by the Fund to all brokers, the percentage of Fund brokerage business handled by J & L, and J & L's rank vis–a–vis other brokers in terms of Fund brokerage business received. The FIC–J & L International agreement was in effect during the fiscal years ending in 1973 and 1974.

Summary of Commissions paid by the Fund to J & L

| Fiscal Year Ending | Commissions Received by J & L | Total Commissions Paid to All Brokers | J & L's Percentage of Total Commissions | J & L's Rank |
|---|---|---|---|---|
| 9/30/71 | $12,038 | $329,180 | 4% | 6th |
| 9/30/72 | 10,839 | 329,490 | 3% | 8th |
| 9/30/73 | 72,853 | 567,447 | 13% | 1st |
| 9/30/74 | 54,338 | 291,194 | 19% | 1st |

See Record, vol. 3, at 1188–89.

[2] All of the defendants other than petitioner settled with the Commission or had the charges

aiding and abetting violations of various provisions of the Investment Company Act of 1940, 15 U.S.C. §§ 80a–1 *et seq.*, the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–1 *et seq.*, the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*

The case against petitioner was tried before an administrative law judge (ALJ). Following an extensive hearing, the ALJ issued a 27–page opinion dismissing the charges. Applying a "clear and convincing" standard of proof, the ALJ concluded that the Enforcement Division failed to establish a nexus between the compensation paid to FIC and the brokerage business allocated to J & L, or that the services performed by FIC for J & L International were worth less than the $25,000 per year which was paid. In addition, the ALJ found no basis for the alleged violations of the antifraud provisions of the Investment Advisers Act, the Securities Act and the Securities Exchange Act.[3]

The decision of the ALJ was appealed to the Commission. Without discussing the holding or reasoning of the ALJ, the Commission entered a five-page opinion in which it found that petitioner willfully aided and abetted a violation of § 17(e)(1) of the Investment Company Act, 15 U.S.C. § 80a–17(e)(1).[4] Pursuant to § 203(e)(5) of the Investment Advisers Act, 15 U.S.C. § 80b–3(e)(5), the Commission censured petitioner for his involvement in the violation. Petitioner appeals from the Commission's censure.

Petitioner claims that the Commission ignored the great weight of the evidence as well as the opinion of the ALJ. He argues that the Commission (1) erroneously failed to apply a "clear and convincing" standard of proof; (2) misinterpreted the scope of § 17(e); (3) improperly shifted the burden of proof to petitioner; (4) refused to consider relevant evidence; and (5) failed to establish the requisite intent.[5]

## I. Standard of Proof

Taking his cue from *Collins Securities Corp. v. SEC,* 562 F.2d 820 (D.C.Cir.1977), the ALJ ruled that the Commission must prove its case by clear and convincing evidence. The Commission overruled the ALJ without discussing the applicable standard.

In *Collins,* the Commission had applied a preponderance of the evidence standard. The District of Columbia Circuit reversed, holding that clear and convincing evidence was required because the case alleged fraudulent conduct and carried potentially severe sanctions. Finding that the alleged violation in this case involved "a breach of fiduciary duty akin to, if not a species of, fraud," Record, vol. 6, at 2431, the ALJ adopted a similar standard. Petitioner argues that clear and convincing is the proper standard, and that the Commission erroneously failed to apply it. Although of the view that it makes no difference in this case, the Commission urges on appeal that this standard is inappropriate in civil actions under the securities laws.

The usual standard of proof in a civil case is "preponderance of the evidence"; in a criminal case it is "beyond a reasonable doubt." Some courts have adopted the intermediate "clear and convincing" standard for certain types of cases, particularly those

---

against them dismissed by the administrative law judge.

**3.** The Enforcement Division did not appeal this portion of the ALJ's decision.

**4.** Section 17(e)(1) provides:

(e) It shall be unlawful for any affiliated person of a registered investment company, or any affiliated person of such person—
(1) acting as agent, to accept from any source any compensation (other than a regular salary or wages from such registered company) for the purchase or sale of any

property to or for such registered company or any controlled company thereof, except in the course of such person's business as an underwriter or broker . . . .

**5.** Petitioner also argues that § 17(e), as interpreted and applied by the Commission, is unconstitutionally vague. Because of our resolution of the case, we need not deal with this issue. The statute, as we have interpreted it, is not impermissibly vague. *Cf. United States v. Deutsch,* 451 F.2d 98, 113–14 (2d Cir. 1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972).

"involving allegations of fraud or some other quasi–criminal wrongdoing by the defendant." *Addington v. Texas*, 441 U.S. 418, 424, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979). The *Addington* case establishes a balancing approach for determining the appropriate standard. The interests of the individual are weighed against the interests of society in determining how the risk of error should be allocated. *Id.* at 423–25, 99 S.Ct. at 1807–1809.

We recognize that SEC disciplinary actions have a penal component and portend serious consequences for the individuals involved. *See Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 180 n.6 (2d Cir. 1976), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). However, these actions are considered remedial in character, with the primary function of protecting the public. *See Blaise D'Antoni & Associates, Inc. v. SEC*, 289 F.2d 276, 277 (5th Cir.), *cert. denied*, 368 U.S. 899, 82 S.Ct. 178, 7 L.Ed.2d 95 (1961); *Pierce v. SEC*, 239 F.2d 160, 163 (9th Cir. 1956). In an action for a stay of an SEC enforcement order, this court was called upon to balance the interests of the public against the interests of individuals excluded from participation in the securities business pending the outcome of their appeals. We found that the personal injury "is not of controlling importance as primary consideration must be given to the statutory intent to protect investors." *Associated Securities Corp. v. SEC*, 283 F.2d 773, 775 (10th Cir. 1960).

■ We also note that the District of Columbia Circuit, the author of *Collins*, recently rejected the contention that *Collins* mandates the use of a clear and convincing evidence standard in a case similar to this one where the Commission censured investment advisers for violations of § 17(e)(1) of the Investment Company Act of 1940, 15 U.S.C. § 80a–17(e)(1). *See Investors Research Corp. v. SEC*, 628 F.2d 168 at 175

n.41 (D. C. Cir.1980). *See also Steadman v. SEC*, 603 F.2d 1126, 1137–40 (5th Cir. 1979). We have weighed the competing interests at play in this case involving aiding and abetting a violation of § 17(e)(1), and conclude that the proper standard here is preponderance of the evidence.

## II. Scope of Section 17(e)(1)

Petitioner argues that the Commission has misinterpreted § 17(e)(1) as a flat prohibition against conflicts of interest. Certain language in the Commission's opinion and its brief on appeal can be read as suggesting that § 17(e)(1) is violated whenever an investment adviser finds himself in a conflict of interest situation with respect to the allocation of brokerage business.[6]

■ We agree with petitioner that such an interpretation of § 17(e)(1) is too expansive. The Investment Company Act and the Investment Advisers Act were designed, in part, to prevent conflicts of interest from affecting the judgment of investment advisers. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186–95, 84 S.Ct. 275, 279–285, 11 L.Ed.2d 237 (1963); *United States v. Deutsch*, 451 F.2d 98, 107–09 (2d Cir. 1971), *cert. denied*, 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972). However, we cannot ignore the plain wording of § 17(e)(1) in an attempt to achieve statutory goals. *See Aaron v. SEC*, —— U.S. ——, ——— – ———, 100 S.Ct. 1945, 1953–1957, 64 L.Ed.2d 611 (1980). The statute prohibits the receipt of compensation in exchange for the purchase or sale of property to or for an investment company. Thus, some nexus must be established between the compensation received and the property bought or sold. Although it need not be shown that there was any "intent to influence," *United States v. Deutsch*, 451 F.2d at 112–13, it must be shown, or be properly inferable, that compensation was received "for" the

---

6. For instance, the opinion states:

Even assuming that Decker rose above the temptation to give J & L more business because of FIC's contract with International, his legal duty was not discharged. The Act required him to avoid any such conflicts of interest.

Record, vol. 6, at 2561. In support, the opinion cites *United States v. Deutsch*, 451 F.2d 98 (2d Cir. 1971), *cert. denied*, 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972), for the proposition that "Section 17(e)(1) prohibits conflicts of interest whether or not actual harm can be shown." Record, vol. 6, at 2561 n.11.

sale or purchase of property. *See United States v. Blitz*, 533 F.2d 1329, 1345 (2d Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 79 (1976).

## III. Burden of Proof

Despite some broadly couched language, we do not believe the Commission's order relies upon an interpretation of § 17(e)(1) which flatly prohibits conflicts of interest. Rather, the Commission held that once a conflict of interest was established, a presumption arose that § 17(e)(1) had been violated. Under the Commission's analysis, the burden shifted upon a prima facie showing of conflict to petitioner to show that none of the money received by FIC was in exchange for Fund brokerage business. The Commission concluded that petitioner failed to carry this burden.

 In order to prove a violation of § 17(e)(1), the Enforcement Division must show that some form of compensation was received in exchange for the purchase or sale of investment company property. Direct evidence of such a transaction will ordinarily not be available. The forbidden compensation will often be disguised by arrangements which are facially proper. In light of this difficulty of proof, the delicate fiduciary relationship involved, *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191, 84 S.Ct. 275, 282, 11 L.Ed.2d 237 (1963), and the statutory policy of preventing conflicts of interest, we believe it appropriate to allow the Commission to apply the common law fiduciary principle that "once a conflict of interest is proven, the burden shifts to the party in conflict to prove that he has been faithful to his trust." *Investors Research Corp. v. SEC*, 628 F.2d at 175 (D.C.Cir.1980). Accordingly, when the Enforcement Division established that petitioner, as investment adviser of the Fund, was in a position where his own interests and the interests of FIC were in conflict with the interests of the Fund, the burden was properly shifted to petitioner to show that his conduct was not violative of § 17(e)(1). It was then incumbent upon petitioner to produce evidence that none of the money received by FIC was in exchange for the brokerage business given by Forum to J & L.[7]

## IV. Relevant Evidence

 In an attempt to establish that the services performed by FIC had a fair market value to J & L International sufficient to justify the $50,000 paid over the two-year period of the agreement,[8] petitioner called several witnesses and produced documentary evidence to explain the bona fides of the agreement, the nature of the services performed by FIC and the need of J & L International for such services. In addition, three independent expert witnesses called by petitioner testified that the services performed by FIC were worth at least $25,000 per year. The Enforcement Division called an ex-member of the Commission's staff who had been involved in the

7. Under the procedure we here approve, the ultimate burden of proof remains on the Enforcement Division to prove each element of the alleged violation by a preponderance of the evidence. When the Enforcement Division introduces prima facie evidence of a conflict of interest in the allocation of brokerage business, the burden is properly shifted to petitioner to come forward with evidence sufficient to justify a finding that no money was received as compensation for the sale or purchase of Fund property. If petitioner produces such evidence, the presumption is no longer operative and the Commission must consider all relevant evidence and determine whether the Enforcement Division established its case by a preponderance of the evidence. *Cf.* Fed.R.Evid. 301.

8. The parties appear to agree that if petitioner can prove that the services rendered by FIC were worth at least $25,000 per year to J & L International, petitioner would satisfy his burden of negating the presumptively illicit nature of the compensation. For purposes of this case, we will accept that position. We note, however, that any form of compensation is proscribed by § 17(e)(1), if it is given "for the purchase or sale" of Fund property. Thus, even if the investment services performed by FIC were worth the entire amount paid for them by J & L International, the arrangement would still be in violation of § 17(e)(1) if the agreement included an understanding that Forum would give Fund brokerage business to J & L. *See United States v. Blitz*, 533 F.2d 1329, 1345 (2d Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 79 (1976).

investigation of the case. He testified that the FIC services were probably worth no more than $5,000 to $10,000.

■ The ALJ concluded that the opinion of the Enforcement Division's expert was not based upon factors within his particular areas of expertise and that he failed to take into consideration some of the services rendered by FIC to J & L International. The ALJ discounted the testimony of the Enforcement Division's expert and accepted the testimony of the three independent experts called by petitioner. He held that "the record as it stands does not support a finding that [the services] could not reasonably be considered to be worth what was paid for them." Record, vol. 6, at 2438–39.

In reaching a contrary conclusion the Commission stated:

> The record is replete with conflicting testimony regarding the value of the services that FIC was providing. As noted earlier, however, FIC did not sell those services to anyone except International so that there is no evidence of what other buyers were willing to pay for them in arm's length transactions. Thus, there is no objective evidence of market value which would enable us to conclude that FIC's services were worth the price that International paid. And, in light of the prophylactic purpose of Section 17(e)(1), we cannot accept in place of that evidence the necessarily subjective, and in some cases self–serving, testimony of respondent's witnesses as to the value of services long since rendered.

Record, vol. 6, at 2561–62. The Commission thus completely disregarded the testimony of petitioner's witnesses and the conclusions and findings of the ALJ. It announced that the only evidence it would consider was evidence of a sale of comparable services by FIC to other customers. In this, the Commission erred. Although proof that similar services were sold by FIC to other customers would no doubt be probative evidence of value, we know of no rule of law that permits a court or agency completely to disregard other valuation evidence which is properly received in the record.

■ The case must therefore be remanded.[9] The Commission must consider all of the evidence properly in the record.[10] It should also give due consideration to the findings of the ALJ.[11]

## V. State of Mind

Before the Commission may levy a sanction under § 203(e)(5) of the Investment Advisers Act, 15 U.S.C. § 80b–3(e)(5), it must first find that petitioner acted "wilfully." The term "wilfully" has been held in similar contexts to mean merely "intentionally committing the act which constitutes the violation. There is no requirement that the actor also be aware that he is violating one of the Rules or Acts." *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965). *See also Capital Funds, Inc. v. SEC*, 348 F.2d 582, 588 (8th Cir. 1965); *Hughes v. SEC*, 174 F.2d 969, 977 (D.C.Cir.1949).

More, however, must be shown to establish the state of mind necessary for aiding and abetting–the offense for which peti-

---

**9.** Although the evidence seems to suggest that FIC's services were in fact worth at least $50,-000 to J & L International, we cannot say at this point that there is not substantial evidence in the record which would warrant a contrary finding. Accordingly, we cannot direct that judgment be entered in favor of petitioner.

**10.** We note that the "subjective, and in some cases self–serving," Record, vol. 6, at 2562, testimony of petitioner's three independent witnesses is no more suspect than the testimony of the Commission's expert who, as an ex–investigator for the Commission in this case, presumably had some self–interest in vindicating the results of the investigation and the decision to prosecute.

**11.** Factual determinations of the Commission must be accepted by this court if they are supported by substantial evidence. Investment Advisers Act § 213(a), 15 U.S.C. § 80b–13(a). In reviewing the record in search of substantial evidence, some weight must be given to the conclusions and findings of the ALJ, who was in a superior position to weigh credibility. More "substantiality" will be accorded to factual findings of the Commission which comport with the findings of the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951); *Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583, 585–89 (D.C. Cir. 1970).

tioner was sanctioned. The exact contours of aiding and abetting liability in the context of the securities laws are largely unsettled. Especially difficult is the nature of the intent or state of mind required for such secondary liability.[12]

The District of Columbia Circuit recently filed an opinion in a case factually similar to this one, in which it deals with this issue. *Investors Research Corp. v. SEC*, 628 F.2d 168 (D.C. Cir. 1980).[13] The Commission's decision in *Investors Research* was heavily relied upon by the Commission in its order censuring petitioner in this case.

The District of Columbia Circuit upheld the Commission's censure of two of the petitioners in *Investors Research* who were found to have violated § 17(e)(1) as principals. This holding was based upon the conclusion that § 17(e)(1) does not require an awareness of wrongdoing.[14] As to a third petitioner who was charged with aiding and abetting a violation of § 17(e)(1), however, the court vacated the Commission's censure. The court held that to establish the aiding and abetting charge, the Commission must prove that petitioner was aware he was involved in an improper activity.

In noting that liability for aiding and abetting "does not directly flow from the statute," *Investors Research Corp. v. SEC*, 628 F.2d at 177 (D.C.Cir. 1980), the court

**12.** It is difficult to divine any consistent rule from the opinions. Many cases do not specifically discuss or consider state of mind requirements peculiar to secondary liability, while other cases assume that negligence is sufficient or that no awareness of wrongdoing is required. *See, e. g., SEC v. Coven*, 581 F.2d 1020, 1028 (2d Cir. 1978), *cert. denied*, 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979); *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 97–98 (2d Cir. 1978); *SEC v. Spectrum, Ltd.*, 489 F.2d 535, 541–42 (2d Cir. 1973); *Stead v. SEC*, 444 F.2d 713, 716–17 (10th Cir. 1971), *cert. denied*, 404 U.S. 1059, 92 S.Ct. 739, 30 L.Ed.2d 746 (1972); *Nees v. SEC*, 414 F.2d 211 (9th Cir. 1969); *Carroll v. First National Bank*, 413 F.2d 353, 354–57 (7th Cir. 1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494 (1970). *See generally* Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification and Contribution*, 120 U.Pa.L. Rev. 597, 630–38 (1972). On the other hand, a number of courts which have addressed the issue have determined that in order to establish liability for aiding and abetting a securities law violation, awareness of wrongdoing must be shown. *See, e. g., Investors Research Corp. v. SEC*, 628 F.2d at 176–179 (D.C. Cir. 1980); *Abrahamson v. Fleschner*, 568 F.2d 862, 871 n.16 (2d Cir. 1977), *cert. denied*, 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978); *Woodward v. Metro Bank*, 522 F.2d 84, 94–97 (5th Cir. 1975); *SEC v. Coffey*, 493 F.2d 1304, 1315–16 (6th Cir. 1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); *Landy v. FDIC*, 486 F.2d 139, 162–67 (3d Cir. 1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). *See also Edward J. Mawod Co. v. SEC*, 591 F.2d 588, 595–96 (10th Cir. 1979). This result was reached in different kinds of cases and without regard to whether awareness of wrongdoing was deemed necessary to establish the underlying offense.

**13.** In discussing this state of mind element, the *Investors Research* case as originally filed used the term "scienter." In response to a motion of the SEC to clarify the use of this word, and to avoid confusion stemming from the limited definition given the term "scienter" in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 190, 193 n.12, 96 S.Ct. 1375, 1379, 1381 n.12, 47 L.Ed.2d 668 (1976), the District of Columbia Circuit replaced every reference to "scienter" with terms such as "state of mind" or "awareness of wrongdoing." We have used similar phraseology in this opinion.

**14.** In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197–201, 96 S.Ct. 1375, 1382–1384, 47 L.Ed.2d 668 (1976), and more recently in *Aaron v. SEC*, —— U.S. ——, ———–——, 100 S.Ct. 1945, 1953–1957, 64 L.Ed.2d 611 (1980), the Supreme Court emphasized that the statutory language is the principal determinant of whether a particular state of mind is a necessary element of a securities law violation. Section 17(e)(1) does not contain words which connote intentional misconduct. Rather, the language, "to accept . . . any compensation," establishes an absolute ban. The language of § 17(e)(1), like the language of § 206(2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6, which the Supreme Court distinguished from the language of § 10(b) of the Securities Exchange Act in *Aaron*, "focuses not on the intent of the investment adviser, but rather on the effect of a particular practice." *Aaron v. SEC*, at ——, 100 S.Ct. at 1954. It appears, therefore, that there is no state of mind requirement under § 17(e)(1).

The *Aaron* case involved a petitioner charged both as a principal and as an aider and abettor. However, the case does not address the question whether a specific state of mind must be shown to establish aiding and abetting liability.

held that to establish aiding and abetting liability under § 17(e)(1),

> three elements must be proven: 1) another party has committed a securities law violation; 2) the accused aider and abetter had a general awareness that his role was part of an overall activity that was improper; and 3) the accused aider and abetter knowingly and substantially assisted the principal violation.

*Id.* at 178.

The court explained the rationale for requiring a state of mind element for aiding and abetting liability even though no such requirement exists for a principal violation of § 17(e)(1):

> The [awareness of wrong–doing] requirement for aiding and abetting liability is designed to insure that innocent, incidental participants in transactions later found to be illegal are not subjected to harsh, civil, criminal, or administrative penalties. This policy is especially germane where the proscribed conduct of the principal may not always appear to be wrongful, as may often be the case under section 17(e)(1).

*Id.* at 177. *See also* Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy,* In Pari Delicto, *Indemnification, and Contribution,* 120 U.Pa.L.Rev. 597, 632–33 (1972).

▮ The petitioner in this case may not have been an innocent, incidental participant in the allegedly improper scheme. It may be that petitioner could have been charged as a principal, or under some other theory of liability. But the fact remains that he is charged with being an aider and abettor. We do not believe that the existence of a state of mind requirement should hinge on the degree of complicity of the aider and abettor in the allegedly improper scheme.[15] Rather, it should depend on the type of liability charged. If the conduct of the participant is directly prohibited by the statute, he may be charged as a principal. Under § 17(e)(1), this presumably requires no particular state of mind. If the conduct is allegedly improper under the secondary liability theory of aiding and abetting, the protective function mentioned in *Investors Research* becomes applicable and an awareness of wrongdoing must be established.[16]

On remand, the Commission must determine whether petitioner acted with the intent necessary to sustain an aiding and abetting charge. Further evidentiary proceedings might be necessary to adequately explore this issue.[17]

### VI. Conclusion

A civil charge of aiding and abetting a violation of § 17(e)(1) must be established by a preponderance of the evidence. The Commission in this case properly shifted the burden of going forward with evidence to petitioner once a prima facie case was established by showing a conflict of interest in the allocation of Fund brokerage busi-

---

**15.** The degree of complicity may be an appropriate consideration in determining whether the requisite state of mind may properly be inferred from the evidence in a particular case. *See Woodward v. Metro Bank,* 522 F.2d 84, 95–96 (5th Cir. 1975). It may also be considered in determining the appropriate sanction once a violation is established.

**16.** We note that a proper showing of reckless conduct might satisfy this state of mind requirement. *Cf. Woodward v. Metro Bank,* 522 F.2d 84, 96 (5th Cir. 1975); *Sullivan v. Chase Investment Services of Boston, Inc.,* 79 F.R.D. 246, 259 n.2 (N.D.Cal. 1978). *See also Edward J. Mawod & Co. v. SEC,* 591 F.2d 588, 595–97 (10th Cir. 1979).

**17.** In its opinion in this case, the Commission stated:

> In *Investors Research,* we noted respondents' previously unblemished record and their good faith belief in the legality of their actions, and concluded that censure coupled with the publication of our opinion was sufficient to satisfy the public interest. The same factors that motivated our leniency there are equally applicable here.

Record, vol. 6, at 2562. This statement is inconsistent with petitioner's having a general awareness that he was participating in an activity that was improper. Accordingly, if it was intended as a finding of fact, the charges against petitioner must be dismissed on remand. However, because the Commission felt it unnecessary to inquire into petitioner's state of mind, this statement may reflect an assumption rather than a finding, relevant only to a determination of the appropriate sanction. If this is the case, the Commission may pursue further the issue of state of mind.

ness. The burden was then on petitioner to produce evidence that he committed no violation of § 17(e)(1). The Commission erred, however, in refusing to consider the testimony offered by petitioner's experts on the value of the services performed by FIC. Accordingly, the case is remanded to allow the Commission to evaluate all of the evidence properly before it. On remand, the Commission must also consider petitioner's state of mind at the time of the allegedly improper conduct.

REVERSED AND REMANDED.

